STATE of Minnesota, Respondent,

v.

Duane Eddie BRIGHT, Appellant.

No. C4–90–1685.

Court of Appeals of Minnesota.

June 18, 1991.

Review Denied Aug. 1, 1991.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty., Lisa A. Berg, Asst. County Atty., Minneapolis, for respondent.

John M. Stuart, State Public Defender, Susan L.P. Hauge, Asst. State Public Defender, Minneapolis, for appellant.

Considered and decided by FOLEY, P.J., and HUSPENI and AMUNDSON, JJ.

## OPINION

FOLEY, Judge.

Appellant Duane Eddie Bright challenges his conviction of a second degree controlled substance crime, arguing the evidence is insufficient to support the verdict and that prosecutorial misconduct during closing argument deprived him of a fair trial. We affirm.

## FACTS

On October 4, 1989, Minneapolis police responded to a neighborhood complaint that two people were selling drugs near the intersection of Golden Valley Road and Upton Avenue North. The caller described the pair as an older black male wearing a long-sleeved sweatshirt with dark sleeves and a baseball cap and a young black woman wearing a jean shirt. The authorities later identified the man as Bright.

Officer Allan Hancock, a narcotics investigator, located a pair fitting the description near the intersection of Golden Valley Road and Thomas Avenue North. He set up surveillance approximately 350 feet from the couple. From his vantage point, the officer had a clear, unobstructed view of the pair's activities using a combination of unaided vision and binoculars.

During the surveillance, Hancock observed Bright enter a building at the corner of Upton Avenue North and Golden Valley Road. A short time later, a young black male (later identified as Q.M.) rode up to the building on his bicycle. At this point, Bright walked out of the building and handed Q.M. what appeared to Hancock "to be a folded up or crumpled up piece of off white colored paper" that was approximately the size of a golf or ping-pong ball. Following the exchange, Q.M. went into the building.

Once Q.M. entered the building, Hancock radioed undercover Officer Clayton Pecore to buy crack from Bright. Pecore testified that when he approached Bright, Bright asked Pecore if he wanted to buy a "rock." Pecore asked whether Bright was dealing, at which point Bright approached the car and asked what Pecore wanted. Pecore asked to buy a rock and Bright asked for payment in advance. Pecore refused to pay in advance and asked to select his own rock. Bright became suspicious and asked for identification. Bright then asked whether Pecore was a police officer. Pecore denied being a police officer. Bright then stated that he recognized Pecore from the force and walked away from the car.

Hancock testified that after Pecore drove away, Q.M. came out of the building and had a brief conversation with Bright as they walked down the street. At that point the lead officer in the area, Sergeant Strauss, ordered the uniformed officers to move in and arrest Bright for lurking with intent to sell drugs.

Squad cars moved in to arrest Bright, but the officers did not discover any drugs or money on him. As the squad cars moved in, Q.M. fled the scene on his bicycle. The police caught Q.M. after pursuing

him for several blocks. The police did not discover any drugs when they searched Q.M., but found $54 in cash, including a $50 bill and a green and white paper package lying near a fence on Q.M.'s escape route. The package contained three lumps of what appeared to be crack cocaine enclosed in a plastic bag. Later chemical testing showed that the substance was .6 grams of crack cocaine.

Q.M., age 17, was arrested and taken to the police station. Following a grant of use immunity and a no-prosecution agreement, Q.M. agreed to testify on behalf of the state. He testified he met Bright for the first time four or five days before the incident in this case. Bright asked him if he wanted to make $20. Q.M. agreed and Bright handed him a foil wrapped package and directed Q.M. to deliver it to a man across the street. Q.M. claims he did not know what was in the package until the man opened the package on delivery. Q.M. kept $20 of the $40 the man paid him.

On October 4, 1989, Q.M. stopped by the building on Upton Avenue and asked Bright what he was doing. Bright asked Q.M. whether he would like to make more money. Again, Q.M. agreed. Bright handed him a white piece of paper that was just big enough to fit into the palm of his hand. Q.M. took the package into the building to a woman who bought two of the five rocks in the package for $40. Q.M. testified that, when he left the building, he gave the money to Bright and attempted to give him the remaining crack. At this point, Bright stated: "Wait a minute. Police. * * * Hold up. Hold up." He then told Q.M. to leave.

Q.M. rode off, tossed the package, dropped his bike and climbed a fence, at which point the police captured him. Q.M. identified the package recovered by the police officer as the package that Bright gave him.

Bright refused to give a statement to police and became violent when the officer suggested that Bright used juveniles to sell drugs. At least two officers testified that it is not uncommon for drug dealers to employ juveniles to sell drugs, thus avoiding having either drugs or money on their persons.

On December 15, 1989, Bright was charged with a second degree controlled substance crime under Minn.Stat. § 152.-022, subd. 1(5)(i) (Supp.1989). After trial, the jury returned a guilty verdict Bright appeals.

## ISSUES

1. Is the evidence sufficient to support Bright's conviction?

2. Does the prosecutor's closing argument warrant a new trial?

## ANALYSIS

1. In reviewing a sufficiency of evidence challenge, this court, after viewing the evidence in the light most favorable to the prosecution, must decide whether a jury could reasonably conclude the defendant was guilty as charged based on the facts in the record and legitimate inferences drawn from them. *State v. Bias*, 419 N.W.2d 480, 484 (Minn.1988). Bright argues the evidence of his guilt was insufficient because the state relied on the uncorroborated testimony of an accomplice.

Minn.Stat. § 634.04 (1988) provides:

A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

After closing arguments, the trial court instructed the jury that corroboration evidence was needed to support Q.M.'s testimony because Q.M. could be charged with a controlled substance crime.[1]

In reviewing the sufficiency of corroboration evidence, this court must

---

1. We express no opinion regarding the accuracy of the court's instruction in this case because the parties have not raised the issue on appeal.

view the evidence in the light most favorable to the prosecution, resolving any conflicts in the evidence in favor of the verdict. *State v. Adams,* 295 N.W.2d 527, 533 (Minn.1980). The "quantum" of evidence necessary depends on the facts of each case. *Id.* (citing *State v. Mathiasen,* 267 Minn. 393, 399, 127 N.W.2d 534, 539 (1964)). Corroboration evidence need not "establish a prima facie case of the defendant's guilt * * * [but] must point to the defendant's guilt in some substantial degree." *Adams,* 295 N.W.2d at 533 (citation omitted). The state may present either direct or circumstantial evidence to corroborate accomplice testimony. *See State v. Stave,* 280 Minn. 269, 270, 158 N.W.2d 848, 850 (1968).

Here, Bright was convicted under Minn. Stat. § 152.022, subd. 1(5)(i). The statute provides:

> A person is guilty of controlled substance crime in the second degree if:
>
>    \*      \*      \*      \*      \*      \*
>
> (5) the person unlawfully sells any amount of a Schedule I or II narcotic drug, and:
>
> (i) the person unlawfully sells the substance to a person under the age of 18, *or* conspires with *or* employs a person under the age of 18 to unlawfully sell the substance;

(Emphasis added.) As in all criminal prosecutions, the state bears the burden of proving each element of the offense beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 361, 90 S.Ct. 1068, 1071, 25 L.Ed.2d 368 (1970).

In order to convict, the state only had to prove one of the three alternative transactions in Minn.Stat. § 152.022, subd. 1(5)(i). Chapter 152, Minnesota Statutes, defines "sell" to mean

> sell, *give away,* barter, *deliver,* exchange, *distribute or dispose of to another;* or to offer or agree to do the same; or to manufacture.

Minn.Stat. § 152.01, subd. 15a (Supp.1989) (emphasis added).

■ The state contends the "sale" was complete when the package was given away or disposed of by Bright. The state maintains it presented sufficient corroboration evidence of the sale. We agree with the state that Hancock's observation of Bright handing a package to Q.M. supports Q.M.'s testimony.

The state also introduced testimony from Pecore regarding Bright's attempted sale of crack cocaine to Pecore on the date of his arrest, which was not completed because Bright recognized Pecore as a police officer. Further, *Spreigl* evidence showed that Bright had used a minor to sell drugs in the past.

The corroboration evidence points to Bright's guilt to a substantial degree. Viewing the evidence in the light most favorable to the prosecution, we conclude the state presented sufficient evidence to support the verdict.

■ 2. Bright argues the state's closing argument was so egregiously improper as to deprive him of a fair trial. The supreme court set out a general standard for appellate review of prosecutorial misconduct, stating that

> in cases involving unusually serious prosecutorial misconduct this court has required *certainty beyond a reasonable doubt* that the misconduct was harmless before affirming. * * * On the other hand, in cases involving less serious prosecutorial misconduct this court has applied the test of *whether the misconduct likely played a substantial part in influencing the jury to convict.*

*State v. Caron,* 300 Minn. 123, 127–28, 218 N.W.2d 197, 200 (1974) (emphasis added) (citation omitted).

■ First, Bright challenges the state's comparison of the quantity of the drug seized to nuclear weapons. Specifically, he objects to the following portion of the argument:

> I don't know how many of you have taken courses in any of the physical sciences, physics or anything like that, or are interested in atomic or thermonuclear reactions, but I can tell you, Ladies and Gentlemen, that the same volume of plutonium or other radioactive material that's contained—if it were contained or

if it were the same volume as the volume of crack/cocaine [.6 grams], that that amount of plutonium would be enough to construct a thermonuclear device that would be approximately ten times as powerful as the thermonuclear devices that were exploded in Hiroshima or Nagasaki. *Rock or crack/cocaine, Ladies and Gentlemen, is the pharmacological equivalent of a thermonuclear device.*

(Emphasis added.)

Bright maintains that the argument severely prejudiced the jury against him because of societal fear of nuclear weapons. The state did not present evidence of the quantity of plutonium used in the nuclear bombs dropped on Japan or of the pharmacological properties or strength of crack cocaine. The trial court sustained an objection to the argument but did not give a curative instruction to the jury. We conclude it was error for the prosecutor to argue matters not adequately supported by the record. The error was lessened, at least in part, when the trial court sustained objection to the statement.

■ Second, Bright objects to the prosecutor's use of evidence not introduced during trial to attack Bright's character. Bright specifically objects to the following portion of the argument:

Well, the street lingo—the street term—street slang for a simulated controlled substance is "turkey dope."

The prosecutor, continuing regarding Bright's nickname, stated:

What nickname? T–Dog. Well, when you heard that, did a little bell start going off in you—in your head the way it did in mine? *T–Dog sells turkey dope. The T–D stands for turkey dope. T–D stands for T–Dog.*

(Emphasis added.) Over objection, the court allowed the argument, ruling that the jury would decide what the evidence was. The state concedes that the record contains *no* evidence of the definition of Bright's nickname. Indeed, when asked whether Q.M. knew what the name meant, he said no.

Moreover, Bright correctly points out, and the state does not dispute, the term

"turkey dog" was not used before closing argument. The only testimony before the jury regarding "fake" or simulated narcotics was offered by Officer Johnsrud, who referred to having purchased a purported "rock" from Bright that turned out to be bar soap.

Again, the prosecutor erred by arguing matters not supported by the record. The error, again, was lessened by the court's instruction to only consider the evidence admitted at trial and that a prosecutor's argument was not evidence.

■ Third, Bright objects to the state's playing of the Stevie Wonder song "Living for the City" to the jury during closing argument. Over defense objection, the court allowed the jury to hear an excerpted portion of the tape. Bright maintains that the tape had the effect of prejudicing the jury against Bright and creating sympathy for Q.M. by drawing a comparison between a naive boy portrayed in the song and Q.M.

The state counters the tape was offered to rebut two anticipated defense arguments, namely that the conversation between Q.M. and Bright was too short to constitute a "sale" and Bright did not use Q.M. to carry drugs for him. Although the tape's purpose may indeed have been to show how brief a narcotic drug transaction can be, a less potentially prejudicial demonstration would have been more appropriate.

Finally, Bright contends that two additional aspects of the argument warrant reversal. We decline to address these aspects of the argument as Bright failed to object at trial. *See State v. Parker*, 417 N.W.2d 643, 647 (Minn.1988) (matters not objected to at trial are generally waived).

■ Having determined that the prosecutor erred in final argument, our inquiry is not complete. Prosecutorial misconduct alone does not warrant automatic reversal. *Caron*, 300 Minn. at 127, 218 N.W.2d at 200.

The court's determination should be reversed on appeal only where the misconduct, viewed in the light of the whole record, appears to be inexcusable and so

serious and prejudicial that defendant's right to a fair trial was denied.

*State v. Wahlberg*, 296 N.W.2d 408, 420 (Minn.1980). The closing remarks strain the extreme outer limits of propriety. Nonetheless, we conclude on the facts of this case that Bright was not deprived of a fair trial. The evidence introduced at trial strongly supports the conviction for sale of a narcotic drug to a minor. Furthermore, the impact of the arguments was lessened by the court's instructions and defense counsel's vigorous closing argument. In future cases, the prosecutor must proceed with care in closing argument and only argue matters that may be fairly drawn from the evidence introduced during trial.

## DECISION

Affirmed.