**STATE of Minnesota, Respondent,**

**v.**

**Timothy Kenbert ENGLE, Appellant.**

**No. A05–2423.**

Court of Appeals of Minnesota.

May 22, 2007.

Lori Swanson, Attorney General, and Susan Gaertner, Ramsey County Attorney, Mark Nathan Lystig, Assistant County Attorney, St. Paul, MN, for respondent.

Steven J. Meshbesher, Meshbesher & Associates, P.A., Minneapolis, MN, for appellant.

Considered and decided by HALBROOKS, Presiding Judge; TOUSSAINT, Chief Judge; and ROSS, Judge.

## OPINION

ROSS, Judge.

This case concerns the conviction of an armed security guard who shot a theft suspect while trying to apprehend him. Timothy Engle appeals from his conviction of reckless discharge of a firearm within a municipality. Engle contends that the state violated his due-process rights by failing to preserve digitally recorded surveillance video footage that might have shown an eyewitness, and that this failure prejudiced him. Engle also maintains that the district court misconstrued the reckless-discharge statute to not require proof that he intentionally discharged his firearm. Because police had no due-process duty to investigate and uncover unpreserved video recordings that might have contained exculpatory evidence, because we find that the state presented sufficient evidence to prove that Engle acted recklessly when he discharged his firearm, and because a reckless-discharge conviction does not require proof of intent, we affirm.

## FACTS

Alan Walker, a private security guard, monitored a live surveillance video feed of a St. Paul apartment building's parking lot in November 2003. At about 2:30 a.m., Walker noticed a car drive onto the lot. More than one person was in the car. The driver parked, got out alone, and walked to an unoccupied car parked nearby. Walker watched him appear to break into the parked car. Walker then quickly went to

the parking lot, where he found fifteen-year-old Hussein Seid Musse emerging from the burgled car and holding a car stereo system. Walker looked inside and saw that the console had been broken apart. Musse asserted that the car belonged to his brother, whom he claimed to live in the apartment building. Dubious, Walker took Musse to the security office to verify his story.

Timothy Engle, also a security guard, arrived at the office to assist Walker. Walker searched Musse, but Musse then fled on foot. Engle and Walker pursued him. Musse ran to the parking lot, entered his car, and started to back out. But he stopped the car when Engle and Walker drew their weapons and ordered him to stop. Engle had a semiautomatic handgun, and Walker had an electric "stun gun" with a laser sight that he shined into the front windshield of Musse's car. Musse put the car in park and raised his hands in surrender.

With his gun drawn and allegedly in what he described as the "up-and-ready" position, Engle opened the driver's door and began to pull Musse from the car. Within seconds, Engle's gun discharged, striking Musse in his lower back and paralyzing him. The parties do not agree concerning Musse's actions immediately before the shooting, but Engle landed on his back and Musse fell to the ground near Engle's feet. Engle testified that Musse lunged at him causing Engle's gun to discharge by accident. A forensic investigator determined that Engle's gun was between one-half inch and three inches from Musse's back when it discharged.

Unviewed portions of video footage of other areas within the apartment building were automatically overrecorded over time. A grand jury indicted Engle on charges of first-degree assault and reckless discharge of a firearm within a municipality. Engle moved to dismiss the indictment based on prosecutorial and police misconduct, contending that the state failed to obtain and preserve exculpatory evidence consisting of the overrecorded portions of the security video footage that might have shown a potential eyewitness. Engle asserted that the state's failure to secure the recording to allow the parties to identify the potential witness warranted dismissal because this witness might have provided exculpatory evidence. Following a hearing, the district court denied the motion, finding that Engle failed to show that any unpreserved portions of the video recording had exculpatory value, that the state knew or had reason to know that portions of the video recording contained potentially exculpatory information, or that the state had a duty to obtain and preserve the recordings.

Before the bench trial, the district court dismissed the first-degree assault charge for lack of probable cause that Engle intended an assault. At the close of the state's case-in-chief and again at the close of all testimony, Engle moved for judgment of acquittal based on insufficient evidence. The district court denied both motions. It found Engle guilty of reckless discharge of a firearm. The court found specifically that Engle acted recklessly when pulling Musse from his car while positioning his gun in a manner that would allow it to discharge and cause harm. This appeal follows.

## ISSUES

I. Does the state's failure to investigate, uncover, and preserve potentially exculpatory evidence violate a defendant's right to due process?

II. Did the state present sufficient evidence to prove that Engle recklessly discharged a firearm?

III. Does a reckless-discharge-of-a-firearm conviction require the

state to prove that the defendant intended to discharge the firearm?

## ANALYSIS

### I

Engle first raises a due-process challenge. He argues that police and prosecutors violated his constitutional rights by failing to obtain and preserve alleged exculpatory evidence consisting of video-recorded surveillance footage from the apartment building's security cameras focused on areas other than the parking lot.

■ We review the district court's legal conclusions de novo but defer to its factual findings unless they are clearly erroneous. *State v. Heath*, 685 N.W.2d 48, 55 (Minn. App.2004), *review denied* (Minn. Nov. 16, 2004). In a criminal case, the state must disclose any evidence within its possession or control that "tends to negate or reduce the guilt of the accused as to the offense charged." Minn. R.Crim. P. 9.01, subd. 1(6). The state's intentional or bad-faith destruction of potentially exculpatory evidence implicates this rule and a defendant's constitutional due-process rights. *See Heath*, 685 N.W.2d at 55–56 (discussing state's obligation to preserve evidence).

In *Brady*, the Supreme Court held that prosecutorial suppression of evidence that is material to guilt violates due process. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). The *Brady* access-to-evidence line of cases has developed to include three basic categories in which prosecutorial conduct may constitute a due-process violation: failure to disclose, failure to preserve, and active interference. The first two categories, nondisclosure and nonpreservation, involve the state's treatment of evidence it possessed, while the third category, active interference, concerns evidence that the state never possessed. The Supreme Court has described the elements of conduct in the first two categories, and has

long held that such conduct may constitute due-process violations. More recently, the state supreme court has indicated the elements of the third category. Although the distinctions between these three types of due-process claims are occasionally confused, a close look demonstrates that Engle's due-process allegation falls afield of them all. Engle's contention that the state violated his due-process rights by its failure to preserve the video recording faces a fundamental factual deficiency under the *Brady* line of cases: the state never possessed or prevented Engle from possessing the supposedly exculpatory evidence that Engle contends it failed to preserve.

The first two categories regard the state's treatment of evidence that it possessed, but which it has rendered unavailable to the defendant by its actions or omissions. These categories are clearly defined in the caselaw. The test to determine whether a due-process violation has occurred regarding unavailable evidence that the state once possessed depends on the nature of the state's conduct.

■ Concerning the first category, in which the state fails to disclose exculpatory evidence, the concealment violates a defendant's due-process rights regardless of the state's motive for the nondisclosure. *Illinois v. Fisher*, 540 U.S. 544, 547, 124 S.Ct. 1200, 1202, 157 L.Ed.2d 1060 (2004); *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97; *State v. Williams*, 593 N.W.2d 227, 234–35 (Minn.1999). To constitute reversible error in this traditional *Brady* situation, the evidence must be favorable to the defendant because it either is exculpatory or has impeachment value, the state must have suppressed the evidence, and its suppression must have prejudiced the defendant. *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999); *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–98; *see also Williams*, 593 N.W.2d at

235–36 (holding that state's failure to disclose evidence does not violate due process when defendant knows about the potential evidence and chooses not to investigate).

■ Concerning the second category, in which the state loses, destroys, or otherwise fails to preserve evidence, the state's conduct may violate a defendant's due-process rights depending on the circumstances. *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988); *California v. Trombetta,* 467 U.S. 479, 486–87, 104 S.Ct. 2528, 2532–33, 81 L.Ed.2d 413 (1984). To establish a due-process violation requiring reversal in this traditional *Youngblood* situation, a defendant must demonstrate that the unpreserved evidence had apparent exculpatory value, that he was unable to obtain comparable evidence by other reasonably available means, and that the state intentionally destroyed or allowed the destruction of the evidence in bad faith. *Youngblood,* 488 U.S. at 57–58, 109 S.Ct. at 337 (requiring showing of bad faith); *Trombetta,* 467 U.S. at 489, 104 S.Ct. at 2534 (requiring showing of apparent exculpatory value and inability to obtain comparable evidence); *see also State v. Nelson,* 399 N.W.2d 629, 633 (Minn.App.1987) (analyzing due-process claim based on destroyed police videotape of drunk-driving suspect's field sobriety tests), *review denied* (Minn. Apr. 17, 1987).

The Supreme Court has recognized, without expressly defining, the third category. In *Trombetta,* it analyzed several defendants' due-process rights concerning the state's failure to retain breath samples that the defendants had provided to police during blood-alcohol-concentration tests. Because the Court expressly "accept[ed] the [state court's] conclusion that the Intoxilyzer procedure brought respondents' breath samples into the possession of California officials," it analyzed the due-process claim as if the state had first possessed and then destroyed the evidence. *Trombetta,* 467 U.S. at 487–89 & n. 7, 104 S.Ct. at 2533–34 & n. 7; *see also Youngblood,* 488 U.S. at 56–58, 109 S.Ct. at 336–37 (explaining *Trombetta* holding as developing test to be applied in nonpreservation-of-evidence cases). But the Court also observed, "Less clear from our access-to-evidence cases is the extent to which the Due Process Clause imposes on the government the additional responsibility of guaranteeing criminal defendants access to exculpatory evidence beyond the government's possession." *Trombetta,* 467 U.S. at 486, 104 S.Ct. at 2532. The *Trombetta* Court then referred to prior dicta to suggest possible due-process violations that might fit this additional *Brady* category concerning evidence never possessed by the government. It noted, as examples, deportation of a defense witness and prosecutorial delay in indicting a defendant to defeat his ability to mount an effective defense. *Id.* But the Court only highlighted the concern; it did not explain how to analyze claims that the government actively kept a defendant from obtaining evidence that the government has never possessed.

Although the Court has not returned to explain the due-process standard that applies in cases concerning governmental restriction on access to evidence that is not in the government's possession, the Minnesota Supreme Court has. In *State v. Larivee,* 656 N.W.2d 226 (Minn.2003), the court considered and rejected a claim of a due-process violation arising in the context of blood-alcohol-concentration testing. The facts in *Larivee* did not fit within the traditional *Brady* or *Youngblood* line because the state neither failed to disclose evidence nor failed to preserve evidence it possessed. Rather, the state denied the incarcerated defendant's request to undertake and have access to "[his] own test" to independently develop evidence regarding

his blood-alcohol concentration after he refused to submit to the state's test. *Larivee*, 656 N.W.2d at 228. The *Larivee* majority tacitly accepted *Trombetta*'s dicta that had suggested that governmental interference with a defendant's collection and use of evidence not possessed by the government may implicate due process. It applied the *Trombetta–Youngblood* test, analyzing whether the evidence had apparent exculpatory value, whether the defendant was able to obtain comparable evidence by other means, and whether the officers had acted in bad faith. *Id.* at 231. And the *Larivee* minority aptly pointed out that the case fit "the third category of cases set out in *Trombetta*," which concerned alleged governmental interference with a criminal defendant's access to exculpatory evidence that is beyond the government's possession. *Id.* at 234 (Meyer, J., concurring in part, dissenting in part).

With this understanding of the three branches of *Brady*, we conclude that Engle's situation fits none of them.

Engle's challenge rests on treatment of video footage that *might* have once existed, but which the police have never seen or possessed. The preserved video footage shows an unidentified male leaving the lobby and following Walker and Engle as they chased Musse, and Walker testified that this man was standing 30 to 40 feet away seconds after the shooting. Because the apartment building's surveillance system automatically overrecords the oldest footage to provide ongoing storage capacity for new footage, any unsaved footage was lost within days of the shooting. Engle complains that the police failed to obtain the additional footage from the building's other surveillance cameras before the footage was overrecorded, claiming that this lost footage might have pictured this person; that, if pictured, the person might have been identifiable; that, if identified, he might have been located; and that, if

located, he might have delivered material, exculpatory testimony. This does not establish a due-process violation under any of the three recognized *Brady* theories.

■ Engle's argument confuses the three *Brady* categories. He emphasizes that the state must disclose all evidence or information in its possession, as though he makes a *Brady* nondisclosure challenge; he applies some, but not all, factors that address claims under the *Youngblood* line, as though he makes out a nonpreservation challenge; and he notes *Trombetta*'s recognition of a third category of possible *Brady* violations, implying that he is asserting a *Larivee* challenge. But his due-process challenge arises only from the automatic erasure of unviewed portions of the security recording that he admits were never seen, let alone possessed, by police. The challenge therefore does not fall within either the nondisclosure or nonpreservation categories. As a unanimous supreme court emphasized, the reason a due-process violation does not arise from evidence that the state never possessed "is obvious, as it would be illogical to impose an obligation on the state to preserve evidence that it does not possess." *State v. Krosch*, 642 N.W.2d 713, 718 (Minn.2002). There is a fundamental difference between cases that concern lost or destroyed evidence and cases "in which the state fails to collect evidence in the first instance." *Id.* at 718–19 (finding no due-process violation when police did not collect evidence because state "could not possibly have had a duty to preserve it").

Engle's claim also does not give rise to a potential due-process violation under *Larivee* based on its acceptance of *Trombetta*'s dicta, because Engle fails to suggest any conduct that would constitute governmental interference with his opportunity to collect the lost footage. Indeed, when asked during oral argument why Engle did

not obtain the footage based on his own knowledge of its existence, counsel responded, "I don't really have a good answer ... I didn't know the videotape would show this unidentified male." When pressed as to why he did not conduct his own investigation and request the videotapes sooner, he responded, "[I]n my typical mode, I waited until the charges were brought." Engle's failure to assert that the police or any state agent acted to restrict him from acquiring the recording on his own is critical.

Engle's claim cannot survive as a traditional *Brady* challenge because it does not involve the nondisclosure of evidence in police possession. Engle's claim also fails as a traditional *Youngblood* challenge because it does not regard evidence that the state first possessed but then lost, destroyed, or otherwise failed to preserve. And his claim cannot survive as a challenge under the third category, active interference with a defendant's right to obtain evidence that the state never possessed; the state's role was, at most, passive as it regards the challenged evidence. There is no indication beyond speculation that the lost footage would actually show the unidentified man any clearer than he appears in the saved footage. Engle concedes that the lost footage might also have led to evidence that is neutral or inculpatory rather than exculpatory. Similarly, police had no reason to believe the footage would include or lead to exculpatory evidence and did nothing to interfere with Engle's opportunity to obtain it. Engle argues in essence that the state must investigate to find conceivably exculpatory evidence. We hold that this evidentiary duty would exceed the duties that arise under the Due Process Clause. We therefore do not apply any of the tests that arise under the *Brady* line and affirm the district court's decision not to dismiss the indictment.

## II

Engle next argues that insufficient evidence supports his conviction. He claims that the only reasonable inference that could be drawn from the evidence is that Musse deliberately caused him to lose his balance by lunging out of the car at him, which, in turn, caused his gun to discharge unintentionally. We disagree that the evidence supports only that conclusion.

We review a claim of insufficient evidence to determine whether a jury could reasonably conclude that the defendant was guilty in light of the facts in the record and all legitimate inferences that can be drawn from those facts. *State v. Merrill,* 274 N.W.2d 99, 111 (Minn.1978). We consider the evidence in the light most favorable to the guilty verdict and assume that the jury believed the state's witnesses and disbelieved contradictory evidence. *Id.* We will not reverse a guilty verdict if the jury, giving due regard to the presumption of innocence and to the state's burden of proof, could reasonably have found the defendant guilty. *State v. Thomas,* 590 N.W.2d 755, 757–58 (Minn. 1999). This standard of review applies also to bench trials. *Davis v. State,* 595 N.W.2d 520, 525 (Minn.1999).

Critical evidence in this case was circumstantial. Although circumstantial evidence is entitled to the same weight as direct evidence, we review it with greater scrutiny when considering a claim of insufficient evidence. *State v. Bauer,* 598 N.W.2d 352, 370 (Minn.1999). The factfinder is in the best position to evaluate circumstantial evidence. *State v. Webb,* 440 N.W.2d 426, 430 (Minn.1989). "The evidence as [a] whole need not exclude all possibility that the defendant is innocent; it must only make such a theory seem unreasonable." *State v. Smith,* 619 N.W.2d 766, 770 (Minn.App.2000), *review denied* (Minn. Jan. 16, 2001). Assessing

the credibility of witnesses and weighing their testimony are within the exclusive province of the factfinder, and the factfinder "is free to accept part and reject part of a witness's testimony." *State v. Landa*, 642 N.W.2d 720, 725 (Minn.2002). The factfinder is also entitled to believe the victim's account of the events even when the testimony of the victim and the defendant differ sharply. *State v. Folley*, 378 N.W.2d 21, 26 (Minn.App.1985).

■ The district court, acting as factfinder, expressly rejected Engle's theory that Musse must have lunged at him and thereby caused his gun to discharge. The court was reasonably puzzled by Engle's assertion, noting that "[i]f Mr. Musse lunged at Mr. Engle and was shot in the right side of his back, that means, assumedly, he lunged at him backwards." The court was entitled to reject Engle's theory as incredible, even if it was supported by expert testimony. Implausibility is ground enough for the rejection.

■ Given the district court's rejection of Engle's lunge theory, there was ample support for the conviction of reckless discharge. A person who "recklessly discharges a firearm within a municipality" commits a felony. Minn.Stat. § 609.66, subd. 1a(a)(3) (2002). A "reckless" act is a conscious and intentional act that the defendant knew or should have known would create an unreasonable risk of harm to others, though he need not have intended to cause harm. *State v. Meany*, 262 Minn. 491, 496, 115 N.W.2d 247, 251 (1962). A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that the element of an offense—here, the discharge of a gun—will result from his conduct. *State v. Cole*, 542 N.W.2d 43, 51 (Minn.1996) (construing portion of statute that prohibits reckless handling of a gun). The term "reckless" refers to the risk created by conduct and the consequences that flow from that conduct, not to

the mental intent that resulted in an act that produced the injury. *Id.* at 52.

■ The state produced sufficient evidence to permit a rational factfinder to find that Engle consciously disregarded a substantial and unjustifiable risk that his gun could discharge and harm another. When Engle ordered Musse to stop his car at gunpoint, Musse put the car in park and raised his hands in surrender. Rather than order Musse to turn off the engine and exit the car, or request Walker to remove Musse while Engle stood holding the handgun, Engle approached the car, opened the driver's door, and attempted to extract Musse by force, gun in hand. Engle testified that positioning the gun in the "up-and-ready" position is "as close to being ready to shoot as you can get, but with the weapon still pointed safely towards the ground." The record does not clearly indicate the gun's exact orientation by reference to the "up-and-ready position," but whatever Engle meant by it, the district court was free to find that it was not "pointed safely towards the ground"; we know that when the gun discharged Engle had failed to prevent it from being directed at Musse's torso.

The district court could have reasonably inferred that Engle had his finger on the trigger while he struggled to pull Musse from the car, because a firearms instructor for the St. Paul Police Department testified that the gun could not discharge except by trigger depression. And the forensic evidence indicated that Engle's gun was between one-half inch and three inches from Musse's back upon discharge. So the facts in favor of the verdict tend to indicate that Engle falsely asserted that Musse lunged at him; that Engle had safer, effective options; that he chose to initiate a physical tussle with one hand while holding in the other a loaded semiautomatic handgun without the safety switch en-

gaged; and that he did so while maintaining his finger on the trigger.

Engle's defense buttressed the state's evidence of recklessness. Engle testified that he kept a bullet in the chamber of his gun at all times while on duty, meaning that when the safety is disengaged the gun will discharge instantly by depressing the trigger. Although maintaining the weapon in a ready condition is not itself reckless, it emphasizes the known danger it might pose if handled during a struggle. Engle knew that Walker had searched Musse for weapons at the security office and found him to be unarmed, calling into question his need to draw the weapon during the apprehension. And Engle testified that he intended not only to pull Musse from the car but also to force him out "facedown," so when the gun discharged Engle had only begun the physical encounter he had planned.

There was sufficient evidence for the district court to find beyond a reasonable doubt that Engle fired his gun by recklessly "having the weapon positioned so that it could be discharged and cause harm while extracting Mr. Musse from the car." The record supports Engle's conviction for reckless discharge of a firearm within a municipality. This conclusion depends also on our rejection of Engle's legal construction, which we turn to next.

### III

Engle last argues that the district court misconstrued the reckless-discharge statute. He contends that the statute also requires proof that he intentionally discharged his gun. We must therefore construe the statute, a legal analysis that we undertake de novo. *State v. Murphy,* 545 N.W.2d 909, 914 (Minn.1996). We find no misconstruction by the district court.

The statute declares that a person commits a felony if the person "recklessly discharges a firearm within a municipali-

ty." Minn.Stat. § 609.66, subd. 1a(a)(3). Engle admits that the plain language of this statute does not require proof of intent to discharge. Engle's argument relies primarily on dicta in *State v. Richardson,* 670 N.W.2d 267 (Minn.2003). *Richardson* involved charges of first-degree murder and first-degree assault, and the defendant argued that the jury should have been instructed on both intentional discharge of a firearm and reckless discharge of a firearm as lesser-included offenses of first-degree assault. *Id.* at 283. In summarizing the elements of each offense, the supreme court stated that reckless discharge "requires proof that the defendant intentionally discharged a weapon in a municipality in a manner that the defendant should have known created an unreasonable risk of harm to others." *Id.* But the *Richardson* court's summary cannot be taken as an exclusive definition of "reckless discharge" because, as such, it was unnecessary to the court's analysis and holding.

As Engle recognizes, we have previously distinguished *Richardson's* broad language in an unpublished opinion and rejected the argument he now asserts. *In re Welfare of R.J.R.,* No. A04–370, 2004 WL 2939332, at *3 n. 1 (Minn.App. Dec.21, 2004). We adopt the reasoning of our unpublished opinion. Although intentionally pulling the trigger may constitute a conscious disregard of a substantial risk, we hold that intentionally pulling the trigger is not necessary for conviction in every circumstance. Insofar as *Richardson* refers to an intentional discharge, it is describing what may be the most common scenario in which reckless discharge may be proven—consciously pulling the trigger in a setting that demonstrates disregard of a known risk.

We construe statutes to ascertain and effectuate the legislature's intent. Minn.

Stat. § 645.16 (2006). The dangerous-weapons statute criminalizes both the intentional discharge of a firearm under circumstances dangerous to another and the reckless discharge of a firearm within a municipality. *Id.* § 609.66, subd. 1a(a)(2), (3) (2002). The two prohibitions, which are listed in immediate sequence within the same subdivision, must be read to address different conduct. *See id.* § 645.16 ("Every law shall be construed, if possible, to give effect to all its provisions."). And if the location of the conduct were the only distinction, the legislature would have no need to employ different *mens rea* requirements. But Engle's reading would result in two different prohibitions for identical conduct. A person would violate the prohibition against intentionally discharging a firearm by intentionally discharging a gun under circumstances that endanger another, and one would violate the prohibition against recklessly discharging a firearm only by intentionally discharging a gun under the same circumstances. Under Engle's argument, either of the provisions becomes superfluous. We conclude that the legislature used different language to prohibit potentially different conduct. We therefore hold that the crime of reckless discharge of a firearm within a municipality does not under these circumstances require proof that the defendant intended to discharge the firearm.

### DECISION

The district court properly denied Engle's motion to dismiss because the state did not violate Engle's due-process rights by failing to investigate to find exculpatory evidence. The record contains sufficient evidence to show that Engle acted recklessly by consciously disregarding a substantial and unjustifiable risk that his gun would discharge and cause harm. The district court properly held that the reckless-discharge statute does not require proof that Engle intended to discharge his gun.

**Affirmed.**