*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1336**

State of Minnesota,
Respondent,

vs.

Vincent Walker,
Appellant.

**Filed September 6, 2016
Affirmed
Bratvold, Judge**

Hennepin County District Court
File No. 27-CR-14-27741

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Jean Burdorf, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Leslie J. Rosenberg, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Bratvold, Presiding Judge; Halbrooks, Judge; and Schellhas, Judge.

**U N P U B L I S H E D   O P I N I O N**

**BRATVOLD**, Judge

On appeal from his conviction of attempted first-degree premeditated murder, Appellant Vincent Walker argues (1) the state failed to prove premeditated intentional

murder beyond a reasonable doubt; (2) the district court erred in failing to suppress Walker's statement to the police because he did not waive his right to remain silent; and (3) the prosecutor committed prejudicial misconduct during closing argument. Walker also makes various arguments in his pro se brief. Because we conclude that (1) the circumstantial evidence, taken together with the direct evidence, was sufficient to prove premediated intentional murder, (2) Walker knowingly, voluntarily, and intelligently waived his constitutional rights before giving a statement to police and failed to unequivocally invoke his right to remain silent, (3) no prosecutorial misconduct occurred, and (4) Walker's pro se arguments lack merit, we affirm.

**FACTS**

For a number of years, Walker and J.W. worked together on various computer software projects. In 2011, they founded Securonet, which developed technology for sharing live video feeds from security cameras. Walker managed the software side, while J.W. managed network communications. Instead of receiving a salary, they both received Securonet stock. Securonet's office was in downtown Minneapolis, where it shared space with another company, Outsell, in the Capella building. During some of this time, Walker lived with J.W. and his family.

Starting in August 2013, Securonet's server was terminated, website access was affected, software was lost, and its domain name was appropriated, for which J.W. faulted Walker. Around September 2013, Walker resigned to provide income for his family. Although the termination appeared amicable to J.W., when he asked Walker for his laptop

2

so he could attempt to recover the backup code, Walker refused, saying he wanted back pay.

J.W. continued to work on Securonet, starting "from scratch." In November 2013, J.W. completed a licensing agreement. In June 2014, J.W. relaunched Securonet with a new product. Securonet starting making sales in August 2014.

On September 18, 2014, J.W. received a text message at about 2:50 p.m. from an unknown phone number; the message said: "time to pay the piper." At 4:34 p.m., J.W. received a second text message from the same number; this message said: "I'm at Outsell waiting o[r] should I stop [at] your home?" Evidence at trial established that at 4:30 p.m., Walker was at the Outsell office in downtown Minneapolis, wearing a flowered shirt and asking for J.W.

After J.W. received the second message, he called the phone number sending the text messages. Walker answered, he was yelling and very angry, and demanded back pay. J.W. told Walker that there were no funds available to pay him, despite recent successes in the company. Walker told J.W that if he did not get his money "there will be blood." Walker then hung up.

Evidence at trial established that, at this time, an Outsell employee overheard Walker having a loud phone conversation with someone regarding money. Walker later told the same employee that, "if somebody owes me money either they pay me back my money or they pay me back with their blood."

3

Concerned, J.W. called his wife, Ms. J.W.,[1] told her about the conversation with Walker, and told her to lock the doors at home. After he finished talking to his wife, J.W. received a third text message: the message stated, "R3d ruM!" At the time, J.W. did not know what the message meant. At trial, J.W. testified that he later understood the message was "murder!" spelled backwards with a "3" substituted for the "E."[2]

J.W. arrived home around 5:30 p.m. Ms. J.W. went to the grocery store leaving at home J.W. and their ten-year-old daughter, T.W., who was working on her homework in the family room.

At approximately 7:30 p.m., the doorbell rang. J.W. opened the front door and saw Walker, who was wearing dark clothing. Walker maced J.W. in the face, struck him in the head, knocked him unconscious, and attacked him with a knife. Walker fled and left J.W. bleeding in the front entryway. When he regained consciousness, J.W. went to the kitchen to grab a towel; T.W. saw him and began screaming for help. Ms. J.W. returned from the store, J.W. told her that Walker injured him, and Ms. J.W. called 911. An ambulance and police arrived. J.W. told both emergency medical responders and police that Walker caused his injuries.

The attack severed J.W.'s index finger, partially severed another finger, and caused lacerations to his scalp, neck, and arm. The laceration to J.W.'s neck measured 15 cm, or approximately 6 inches, and J.W.'s external jugular vein was lacerated. The laceration to

---

[1] J.W.'s wife also has the initials "J.W." For clarity, this opinion will refer to J.W.'s wife as "Ms. J.W."

[2] This reference was used in the book and movie, The Shining, by Stephen King.

J.W.'s scalp was 18 cm, or 7 inches, and the force from the object that caused the injury was so significant that it penetrated the scalp and the skull. The arm laceration was 10 centimeters, or almost 4 inches in length. The lacerations were repaired by suture, but J.W.'s index finger could not be reattached.

The police contacted Walker and requested to speak with him regarding an assault. Walker agreed and, after a Miranda warning, gave a recorded statement. The state charged Walker with first-degree murder, which was later amended to attempted-first-degree murder. Evidence at trial established that Walker sold knives and mace for income, the police found these items in Walker's possession, but police never identified the knife used in the attack, nor was there any DNA evidence linking Walker to the crime.

On March 16, 2015, Walker filed a motion to suppress his police statement, arguing that there was no valid waiver of his constitutional rights. The district court denied Walker's motion. In April 2015, after a six-day trial, the jury found Walker guilty. Walker was sentenced to 240 months in prison. This appeal follows.

**D E C I S I O N**

### I. The state offered sufficient direct and circumstantial evidence of intent and premeditation.

Walker argues that there was insufficient evidence to prove that he acted with premeditated intent to murder J.W. A defendant is guilty of attempted murder when he, "with intent to commit a [murder], does an act which is a substantial step toward . . . the commission of the [murder]." Minn. Stat. § 609.17 subd. 1 (2014). First-degree murder requires "caus[ing] the death of a human being with premeditation and [] intent to effect

5

the death of the person or of another." Minn. Stat. § 609.185 (a) (1) (2014). Criminal intent "means that the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." Minn. Stat. § 609.02, subd. 9(4) (2014). "'Premeditation' means to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn. Stat. § 609.18 (2014).

"Because intent and premeditation are states of mind, they are generally proved only by inferences drawn from a person's words or actions in light of all the surrounding circumstances." *State v. Andrews*, 388 N.W.2d 723, 728 (Minn. 1986). Intent is "determined from all the objective facts and circumstances." *State v. Whisonant*, 331 N.W.2d 766, 768 (Minn. 1983). A jury may infer a person's intent to murder based on evidence demonstrating "deliberate and intentional use of a deadly weapon, the natural result of which could well have led to the victim's death." *State v. Geshick*, 283 Minn. 380, 382, 168 N.W.2d 331, 332 (1969) (affirming conviction of first-degree murder where single inflicted knife wound was shallow). Premeditation may be inferred by evidence that shows planning, activity, motive, the nature of the killing, and a defendant's actions. *State v. Barshaw*, 879 N.W.2d 356, 363 (Minn. 2016) (discussing planning, activity, motive, and nature of killing); *State v. Leake*, 699 N.W.2d 312, 321 (Minn. 2005) (discussing defendant's actions before and after the murder).

In this case, both appellant and respondent argue that the jury relied on inferential or circumstantial evidence in convicting Walker. Our review of the record and the applicable law leads us to conclude that direct evidence also was admitted to prove Walker's intent and premeditation. Direct evidence includes a defendant's own statements

6

because they allow the jury to find premeditation and intent without having to draw any inferences. *State v. Horst*, 880 N.W.2d 24, 40 (Minn. 2016) (holding appellant's statement that she wanted victim dead was direct evidence of mens rea); *see generally State v. Clark*, 739 N.W.2d 412, 421 n.4 (Minn. 2007) (holding direct evidence proves a fact without any inference or presumption). We must first analyze the direct evidence of intent and premeditation before considering the circumstantial evidence discussed by the parties. "[W]hen a disputed element is sufficiently proven by direct evidence alone," our review is governed by the traditional standard for sufficiency of the evidence. *Horst*, 880 N.W.2d at 39. Under the traditional standard, "we make a painstaking review of the record," *State v. Brown*, 732 N.W.2d 625, 628, to determine whether the evidence, "when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989).

Here, the state offered evidence that, just hours before the attack, Walker sent three text messages to J.W. stating that (1) it was "time to pay the piper," (2) he was waiting at J.W.'s office, asking whether he should meet J.W. at his house, and (3) "R3d ruM!" When J.W. told Walker there was no money to pay him, Walker responded that if he was not paid, "there will be blood." At about the same time, Walker told an employee at Outsell that, "if somebody owes me money either they pay me back my money or they pay me back with their blood."

When viewed in the light most favorable to the jury's verdict, evidence of Walker's statements is not sufficient to support a finding of premeditated intentional murder. Although Walker's statements refer to "paying the piper," going to J.W.'s home, and

7

"blood" in return for an unpaid debt, none of these statements refer to murder or J.W.'s death. In a similar case where the state offered a defendant's statements as direct evidence of mens rea, the supreme court held the statements were sufficient because the defendant explicitly stated she wanted the victim dead. *Horst*, 880 N.W.2d at 40. While the "R3d ruM!" text allows the jury to infer a threat to murder, this inference is circumstantial evidence of intent. *Clark*, 739 N.W.2d 421 n.4 (stating circumstantial evidence requires an inference to prove a fact). Thus we proceed to consider the sufficiency of the circumstantial evidence of premediated intent.

In reviewing the sufficiency of circumstantial evidence, this court uses heightened scrutiny and a two-step analysis. *State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013). "The first step is to identify the circumstances proved. In identifying the circumstances proved, we defer to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the [s]tate." *Id.* at 598–99 (citation and quotation omitted). The reviewing court "construe[s] conflicting evidence in the light most favorable to the verdict and assume[s] that the jury believed the [s]tate's witnesses and disbelieved the defense witnesses." *Id.* at 599 (quotation omitted). "The second step is to determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Id.* (quotation omitted). When applying this test, we view the circumstances proved as a whole and not as discrete and isolated facts. *State v. Matthews*, 800 N.W.2d 629, 635-36 (Minn. 2011). We will not overturn a conviction based on circumstantial evidence on the basis of mere conjecture. *State v. Lahue*, 585 N.W.2d 782, 789 (Minn. 1998).

8

First, we consider the circumstances proved. These circumstances include Walker's statements, already discussed as direct evidence, because inferences may be drawn from those statements. In addition to Walker's statements that it was "time to pay the piper," "there will be blood," paying with "blood," and "R3d ruM!," the circumstances proved include defendant's conduct. Walker made the statements a few hours before he attacked J.W. Walker waited at J.W.'s office; and Walker demanded money from J.W. Walker was yelling and very angry.

In about two hours' time, Walker changed into dark clothing, brought a knife and mace, and went to J.W.'s home, where he rang the doorbell. Moreover, Walker attacked J.W. with the mace first, then the knife, stabbing J.W. and causing lacerations to his scalp and neck, severing an index finger, partially severing another finger, and lacerating his arm. J.W.'s injuries were not life-threatening, but were forceful. Although a knife was never found with J.W.'s DNA, Walker sold knives and mace for a living, and both items were later found in Walker's possession.

Second, we determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt. *See Silvernail*, 831 N.W.2d at 599. The circumstances proved, as a whole, support a rational inference that Walker attempted premeditated intentional murder of J.W. Walker argues that there was no intent or premeditation because his motive was to get paid, he had no plan to commit murder, character witnesses testified that Walker is a peaceful person, and J.W.'s injuries were not life-threatening. But the record does not support Walker's alternative explanation of J.W.'s injuries.

Premeditated intentional murder is the only reasonable hypotheses for several reasons. First, Walker's anger over money and Walker's repeated threats of paying the "piper," "blood," paying with "blood," and "R3d ruM!" permit only one inference— Walker sought to harm J.W. and intended to murder J.W because of an unpaid debt. *See State v. Ortega*, 813 N.W.2d 86, 101 (Minn. 2012) (holding that evidence of prior threats may establish motive and premeditation); *State v. Palmer*, 803 N.W.2d 727, 735 (Minn. 2011) (same). While motive evidence is not necessary to find premeditation, it allows the jury to infer that a defendant deliberated before killing. *Ortega*, 813 N.W.2d at 101.

Second, Walker's conduct shows premeditation and planning—over the course of a few hours, Walker made repeated threats to J.W. and repeated those threats to an Outsell employee. After J.W. refused Walker's demand for money, he changed his clothes before going to J.W.'s home and armed himself with a knife and mace. *See State v. Kendell*, 723 N.W.2d 597, 606 (Minn. 2006) (noting that concealing identity after murder "reveals a cool, calm behavior consistent with premeditation"); *State v. Barshaw*, 879 N.W.2d 356, 364 (Minn. 2016) (finding that defendant's decision to arm himself and pursue his victim is planning evidence that supports the inference of premeditation). Walker then attacked J.W at the door of his home.

Third, even though J.W.'s wounds were not life-threatening, the evidence showed sufficient force to J.W.'s knife wounds, supporting only one inference: murder was the objective. *See Andrews*, 388 N.W.2d at 728 (finding intent to kill proved by circumstantial evidence where victim "was stabbed once, with sufficient force"); *see also Geshick*, 283

10

Minn. at 382, 168 N.W.2d at 331-32 (affirming conviction of first-degree murder based on single, shallow knife wound).

Based on the evidence, these circumstances are inconsistent with the alternative hypothesis that Walker's attack of J.W. was to get paid. J.W. told Walker he would not be paid. While the unpaid debt may have motivated the attack, it is unreasonable to infer that Walker did not plan to murder J.W. Based on the circumstances proved as a whole, including Walker's threats and the injuries inflicted by the knife attack at J.W.'s home, the jury made the only rational inference and convicted Walker of first-degree attempted murder. The circumstantial evidence is sufficient to support the verdict that Walker acted with premeditation and intent to kill J.W.

## II. The district court did not err by denying Walker's motion to suppress.

Walker argues that his statement should be suppressed because he never validly waived his *Miranda* rights. An effective *Miranda* warning must notify the suspect

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 1624 (1966). The state bears the burden of demonstrating that defendant validly waived his *Miranda* rights. *Id.* at 475, 86 S. Ct. at 1628. The state generally proves a waiver was knowing, voluntary, and intelligent when it establishes that: (1) *Miranda* warnings were given; (2) the defendant indicated that he understood his rights; and (3) the defendant gave a statement. *State v. Linder*, 268 N.W.2d 734, 735 (Minn. 1978).

11

Walker argues that he invoked his right to remain silent when he told police, "No, I don't have any recollection of an assault." The district court found that Walker was given a *Miranda* warning, said he understood his rights, and then gave a voluntary statement. Also, the district court concluded that Walker's comment about not remembering the assault did not invoke the Fifth Amendment.

"We review findings of fact surrounding a purported *Miranda* waiver for clear error, and we review legal conclusions based on those facts de novo to determine whether the state has shown by a fair preponderance of the evidence that the suspect's waiver was knowing, intelligent, and voluntary." *State v. Burrell*, 697 N.W.2d 579, 591 (Minn. 2005). We review the factual issue of whether an accused unequivocally and unambiguously invoked the right to remain silent for clear error. *State v. Marshall*, 642 N.W.2d 48, 53 (Minn. App. 2002), *review denied* (Minn. May 28, 2002). The inquiry is whether the accused asserted his right in a way that a "reasonable police officer in the same circumstances would understand the statement to be an invocation of the right to remain silent." *Id*. The Minnesota Supreme Court has held that "nothing short of an unambiguous or unequivocal invocation of the right to remain silent will be sufficient to implicate *Miranda*'s protections." *State v. Ortega*, 798 N.W.2d 59, 68 (Minn. 2011)

The record supports the district court's order denying Walker's motion to suppress. As a preliminary matter, the parties do not dispute that Walker went to the police station voluntarily and was in custody when he was interviewed by police. Similarly, it is not disputed that, before any questions, police told Walker he was under arrest, read Walker his *Miranda* rights and Walker said he understood those rights.

12

The officer then asked Walker if he wanted to talk about the assault, and Walker stated "No, I don't have any recollection of an assault." After again stating he did not recall an assault, Walker continued to speak with police. The district court concluded that "under a totality of the circumstances, [Walker] did not [un]equivocally and unambiguously invoke his Fifth Amendment rights."

We agree with the district court that Walker's response is equivocal and ambiguous and therefore did not invoke his right to remain silent. Walker's statement must be taken as a whole. *Ortega*, 798 N.W.2d at 68 ("we view invocations of the right to remain silent in light of all the circumstances"). Walker volunteered a lack of memory, perhaps as a defense, and did not say he wanted to remain silent. Walker's statement is insufficient to invoke the Fifth Amendment, because it requires an unequivocal and unambiguous statement by the defendant that he does not wish to talk. *Compare Ortega*, 798 N.W.2d at 70 (holding right to remain silent is not invoked where defendant's ambiguous statement did not say he did not want to talk with law enforcement) *with State v. Marshall*, 642 N.W.2d 48, 54 (Minn. App. 2002) (holding right to remain silent invoked when defendant stated, "No. I don't wish to say anything"), *review denied* (Minn. May 28, 2002). Because Walker's ambiguous statement, taken as a whole, did not express a desire not to speak, he did not invoke his Fifth Amendment rights.

Because we conclude, as the district court did, that Walker was read *Miranda* warnings, understood them, did not invoke his Fifth Amendment rights, and then gave a voluntary statement to the police, the district court did not err in denying Walker's motion to suppress.

**III.    The prosecutor did not commit misconduct.**

Walker argues that, during the state's closing argument, the prosecutor misstated the reasonable doubt standard and disparaged the defense, therefore compromising Walker's right to a fair trial. Walker acknowledges that he did not object to the alleged prosecutorial misconduct at trial. Unobjected-to prosecutorial misconduct is reviewed using a modified plain-error test. *State v. Carradine*, 812 N.W.2d 130, 146 (Minn. 2012). "When assessing prosecutorial misconduct, the closing argument will be considered as a whole." *See State v. Powers*, 654 N.W.2d 667, 678 (Minn. 2003).

Under the modified plain-error test there must be "(1) [an] error; (2) that is plain; and (3) the error must affect substantial rights." *State v. Ramey*, 721 N.W.2d 294, 298 (Minn. 2006) (quotation omitted). An error is plain if it "contravenes case law, a rule, or a standard of conduct." *Id.* at 302. In cases of prosecutorial misconduct, the appellant has the burden of proving there was error and that it was plain. *Id.*  If the appellant meets his burden, the state must show that the error did not affect appellant's substantial rights such that "there is no reasonable likelihood that the absence of the misconduct in question would have had a significant effect on the verdict of the jury." *Id.* (quotations omitted). If the first three prongs are met, we may correct the error if necessary to "ensure fairness and the integrity of the judicial proceedings." *Id*. at 298 (quotation omitted).

We first examine each claim individually to determine whether it constitutes misconduct. *State v. Dobbins*, 725 N.W.2d 492, 506 (Minn. 2006). If we determine there was prosecutorial misconduct, we then examine the misconduct individually and cumulatively to determine whether the misconduct denied Walker a fair trial. *Id.*

14

## A.      The reasonable doubt standard

Walker argues that the prosecutor misstated the burden of proof and, by doing so, confused the jury and diluted the standard. Misstating the burden of proof constitutes prosecutorial misconduct, yet a "legitimate explanation of the [s]tate's burden is proper." *State v. Martin*, 773 N.W.2d 89, 105 (Minn. 2009); s*ee State v. Vue*, 797 N.W.2d 5, 13–14 (Minn. 2011) (holding no plain error when prosecutor's explanation of burden of proof, read in context, was not improper).

Here, the prosecutor argued as follows:

> But when you consider proof beyond a reasonable doubt, keep the doctrine in focus. Don't lose perspective, don't be misled, because there is nothing magical or mystical about it. Proof beyond a reasonable doubt does not mean proof beyond a shadow of all doubt, it doesn't mean proof beyond all possibility of doubt, and it does not mean proof to a mathematical certainty. Why? Because, ladies and gentlemen, in life all things are subject to some doubt. We even have well-respected philosophers who can credibly argue about whether we even exist.
>
> When you apply the principle of proof beyond a reasonable doubt, use your common sense and everyday experiences. Reasonable doubt is not doubt created by the imagination or the ingenuity of defense counsel. Don't be misled. As the judge has defined it, the instructions read proof beyond a reasonable doubt is the same thought process that each and every one of you go to in making your important day-to-day life decisions.

The prosecutor gave both an explanation and the standard for reasonable doubt. Because the prosecutor's statements, when read in context, are consistent with the applicable case law and do not improperly misstate the burden of proof, no prosecutorial misconduct occurred. *See State v. Jones*, 753 N.W.2d 677, 691 (Minn. 2008) (holding prosecutor's

explanation of reasonable doubt standard using beyond *"all possibility of doubt"* was proper); *see also Vue*, 797 N.W.2d at 13–14.

## B.    Disparaging the defense

Walker contends that, during the closing argument, the prosecutor disparaged the defense by stating that counsel's questioning of J.W. showed "ingenuity." Generally, it is prosecutorial misconduct to "disparage the defense." *Powers*, 654 N.W.2d at 678–79. But the prosecutor has "considerable latitude" in making a closing argument, and the argument is not required to be "colorless." *State v. Williams*, 586 N.W.2d 123, 127 (Minn. 1998). Additionally, "[p]rosecutors may comment on the adequacy of evidence presented at trial during closing arguments." *Vue*, 797 N.W.2d at 15.

During J.W.'s cross-examination, the defense asked if it was possible that he mistook the attacker for Walker because he was expecting Walker based on the text messages. J.W. responded that it was "possible." On redirect, J.W. was asked additional questions and he confirmed the identification of Walker as his attacker.

During closing argument the prosecutor commented on defense counsel's "ingenuity" in asking a question that may have persuaded the jury to believe that J.W. was unsure about the identity of his attacker. The prosecutor argued that this was not reasonable doubt because, when J.W. was questioned on redirect, he stated that he was sure that Walker was his attacker.

Viewing the prosecutor's closing argument in context, the comment about counsel's ingenuity was not made for an improper purpose, but rather to respond to the defense theory based on evidence presented at trial. Moreover, the district court gave the standard jury

16

instruction that attorneys' statements are not evidence. *See* 10 *Minnesota Practice*, CRIMJIG 3.11 (2014)*; see also State v. Bright*, 471 N.W.2d 708, 713 (Minn. App. 1991) (noting any impact of prosecutorial misconduct was diminished by the court's instructions), *review denied* (Minn. Aug. 1, 1991). Therefore, we conclude that the comment was not prosecutorial misconduct.

We note that because Walker has not established prosecutorial misconduct with either of the two comments he identifies, no further analysis of this issue is required.

**IV.     The prosecutor did not have an obligation to obtain exculpatory evidence.**

Walker argues that the prosecutor or the police were obligated to obtain bus and light rail video that would have supported an alibi defense. Walker does not argue that there was a *Brady* or discovery violation. *See* Minn. R. Crim. P. 9.01, subd. 1(6) (requiring a prosecutor to disclose exculpatory evidence); *see also Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963) (holding that due process is violated when the prosecution withholds material, exculpatory evidence). Instead, Walker argues that the prosecutor was required to obtain exculpatory information on his behalf.

No due process violation arises from evidence that was never seen or possessed by the police because "it would be illogical to impose an obligation on the state to preserve evidence that it does not possess." *State v. Krosch*, 642 N.W.2d 713, 718 (Minn. 2002). The state's discovery obligation only applies to evidence that is actually in the state's possession. *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S. Ct. 989, 1001 (1987). Any claim that the state must seek evidence "exceed[s] the duties that arise under the Due Process Clause." *State v. Engle*, 731 N.W.2d 852, 859 (Minn. App. 2007).

The record reflects that the state did not interfere with Walker's ability to obtain any bus or light rail video evidence. The record also establishes that the state did not possess any bus or light rail video evidence. The state is required to disclose evidence in its possession or control. Minn. R. Crim. P. 9.02, subds. 1, 1a (stating the scope of discovery obligation without a court order).We therefore reject Walker's claim that the state must obtain exculpatory evidence for him because this claim lacks any legal support.

**V.    Walker received effective assistance of counsel.**

In his pro se brief, Walker argues he was deprived a fair trial due to ineffective assistance of counsel. More specifically, he argues that his counsel was ineffective for failing to: (1) investigate and obtain bus and light rail videos for his alibi; (2) obtain medical records related to his medical condition; and (3) obtain Securonet documents.

To succeed on a claim of ineffective assistance of counsel, "[t]he defendant must affirmatively prove that his counsel's representation 'fell below an objective standard of reasonableness' and 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Gates v. State*, 398 N.W.2d 558, 561 (Minn. 1987) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 2064, 2068 (1984)). Appellate courts "will generally not review an ineffective-assistance-of-counsel claim that is based on trial strategy." *Andersen v. State*, 830 N.W.2d 1, 10 (Minn. 2013). Because a claim of ineffective assistance of counsel involves a mixed question of law and fact, our review is de novo. *Hawes v. State*, 826 N.W.2d 775, 782 (Minn. 2013).

First, Walker contends that his counsel provided ineffective assistance when they failed to obtain bus and light rail videos. Walker claims this evidence would have provided him with an alibi and proved that he was wearing a floral shirt on the day of the incident, unlike the attacker, who wore dark clothing. Walker is correct that counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535, (2003). And counsel's judgments are given a "heavy measure of deference." *Id*. at 522, 123 S. Ct. at 2535.

Here, Walker's trial counsel's decision not to obtain or use these videos was related to trial strategy. *See Andersen*, 830 N.W.2d at 10 (stating that appellate courts do not review claims related to trial strategy). Notably, the state argued that Walker had ample time to change clothes after leaving Capella tower and before the assault occurred, which is when any video would have been recorded. We conclude that trial counsel's decision to not obtain or use any video was strategic and therefore Walker was not denied effective assistance of counsel.

Next, Walker argues that his counsel failed to obtain medical records related to his medical condition of hypertension and blackouts. Evidence of Walker's tendency to blackout was introduced at least three times during Sergeant Osland's testimony. But Walker's trial counsel chose not to offer the blackout condition as a defense, which is a question of trial strategy. To raise this defense, Walker would have had to implicitly concede that Walker was the person who attacked J.W. Because "matters of trial strategy, including which defenses to raise at trial, will not be reviewed later for competence," we

19

conclude that Walker was not denied effective assistance of counsel when his counsel did not obtain medical records. *Voorhees v. State*, 627 N.W.2d 642, 651 (Minn. 2001).

Finally, Walker argues that his counsel failed to obtain documents related to Securonet. But the facts related to Securonet were not at issue in this case. Moreover, J.W. did not dispute that Walker was an owner in Securonet and was owed money. Thus, trial counsel's decision not to obtain any additional evidence related to Securonet was a matter of trial strategy and, therefore, Walker was not deprived of a fair trial due to ineffective assistance of counsel.

**Affirmed.**