STATE of Minnesota, Respondent,

v.

Danny ORTEGA, Jr., Appellant.

No. A10–507.

Supreme Court of Minnesota.

June 1, 2011.

Lori Swanson, Attorney General, Kelly O'Neill Moller, Assistant Attorney General, St. Paul, MN, Paul Kiltinen, Dodge

County Attorney, Mantorville, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Rochelle R. Winn, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

ANDERSON, G. BARRY, Justice.

Appellant Danny Ortega Jr., following a jury trial, was convicted of aiding and abetting first-degree premeditated murder, Minn.Stat. §§ 609.185(a)(1), 609.05, subd. 1 (2010), in the stabbing death of Troy Ulrich. Appellant challenges his conviction on appeal, arguing that the district court erred when it denied his pretrial motion to suppress statements made to law enforcement officials after appellant allegedly invoked his state and federal constitutional rights to remain silent and to have counsel present during custodial interrogation.[1] We affirm.

On February 16, 2008, Troy Ulrich was stabbed to death in a garage at his apartment building in Claremont, Minnesota, where he lived with his fiancé. Appellant Danny Ortega Jr. lived with his grandfather in Apartment A, which was on the same floor as Ulrich's Apartment C. Appellant's girlfriend, Marissa Lane, and appellant's father, Danny Ortega Sr. (Ortega Sr.), sometimes stayed overnight at Apartment A. Appellant's uncle, Arnulfo Bermea Sr., also lived in the apartment building. Arnulfo rented the garage where Ulrich was killed.[2]

On the afternoon of February 15, 2008, a group of people—including appellant, Lane, and appellant's cousins Eric and Anthony Bermea—gathered in Apartment A to play cards and drink alcohol. When the group ran out of beer, appellant went across the hall to Apartment C and asked Ulrich to join them. Ulrich came to Apartment A and brought beer that he shared with the others. Several members of the group, including appellant and Ulrich, snorted cocaine at some point during the night.

Soon after Ulrich arrived, Ulrich and appellant left the apartment together for ten to fifteen minutes. When they returned, appellant and Lane went into appellant's bedroom. Meanwhile, Ulrich told Eric and Anthony that appellant had warned him that the brothers "were bad people to be around." The brothers went into appellant's room to confront him. Appellant denied making any such comments and called Ulrich a liar. Appellant and Ulrich began to argue. Appellant grabbed a baseball bat from his bedroom and demanded that Ulrich leave the apartment. Lane took the bat away, but appellant then picked up a machete and threatened Ulrich, saying that appellant would "fuck him up." To avoid an argument, Ulrich, Eric, and Anthony left the apartment. As they were leaving, Eric heard appellant call someone whom Eric assumed was Ortega Sr. and complain that "somebody was fucken [sic] with him." Anthony retrieved the garage key from his father's apartment.

---

**1.** Appellant also challenges the jury's verdict on the charge of aiding and abetting first-degree felony murder while committing a burglary in violation of Minn.Stat. §§ 609.185(a)(3) and 609.05, subd. 1 (2010). Because we affirm appellant's conviction and sentence for aiding and abetting first-degree premeditated murder, we need not consider appellant's arguments regarding the burglary verdict.

**2.** Arnulfo allowed his relatives, including his two sons, Eric and Anthony Bermea, to use the garage to work on cars. Arnulfo carried the only set of keys to the garage. When others wanted to enter the garage, they had to ask his permission.

Eric, Anthony, and Ulrich then went to the garage, where the men continued to drink.

Lane testified that when Ortega Sr. arrived at Apartment A, he was drunk and "ranting and raving." Appellant and Ortega Sr. began talking in Spanish, which Lane could not understand. Before leaving the apartment, the Ortegas told Lane they were going to the garage to confront Ulrich.

When appellant and his father reached the garage, they walked in through the unlocked door without knocking. Eric testified that the Ortegas looked angry and, based on the Ortegas' expressions, Eric thought there would be a fight. Anthony tried to stop the Ortegas from approaching Ulrich because he did not want the altercation from Apartment A to resume, but appellant pushed Anthony out of the way. Anthony tripped and cut his hand on an air compressor.

Ortega Sr. went to Ulrich, shoved him, and asked, "What the fuck do you have with my son?" Ulrich pushed back and said that he did not have any problem with appellant. Eric attempted to intervene, but Ortega Sr. told Eric to "[g]et the fuck out of the way." Ortega Sr. then started throwing punches at Ulrich. Ulrich picked up a metal light stand and hit Ortega Sr. hard enough to cause him to fall to the ground. After Ulrich hit Ortega Sr., appellant began striking Ulrich with a pair of bolt cutters. Ortega Sr. stood up and both he and appellant continued hitting Ulrich. Eric and Anthony heard Ulrich yell, "He's got a knife." Ulrich, who had only one arm after an amputation, fell to the ground. Neither Eric nor Anthony saw a knife in the hands of appellant or his father, but they saw Ortega Sr. make a stabbing motion during the fight, and Anthony saw appellant hit and kick Ulrich. At that point, Eric saw that Ulrich was bleeding and Eric and Anthony left the garage. Ulrich died that night as a result of the altercation.

Eric and Anthony went back to Arnulfo's apartment and told him there was a fight in the garage. Arnulfo told the brothers to get everyone out of the garage and lock it up. Anthony called appellant and told him to move Ulrich's body out of the garage. Appellant asked Eric and Anthony to help him move the body, but the brothers refused. The Bermeas did not call the police; Eric testified that he was afraid he would get in trouble for using cocaine earlier that night.

Appellant, his father, and Lane attempted to clean up the scene and destroy incriminating evidence. Appellant and Ortega Sr. entered Apartment A covered in blood. The Ortegas washed off the blood, and Ortega Sr. asked Lane to dispose of their clothes and shoes in the dumpster located outside the apartment building. Lane saw Ortega Sr. washing a knife with bleach. Appellant dragged Ulrich's body out of the garage and into the apartment hallway. On the way back to Apartment A, appellant asked another cousin who lived in the building whether Ortega Sr. could stay with the cousin because appellant and Ortega Sr. had killed someone.

When Lane and appellant returned to Apartment A around 2 a.m., Ortega Sr. was talking to Bradley Schmoll. Ortega Sr. gave Schmoll the murder weapon and asked him to keep it. Schmoll agreed and hid the knife in his home. He later turned it over to the police. Lane heard Ortega Sr. tell appellant that Ortega Sr. would take the blame for everything. Appellant and Lane then fled to a friend's house in Austin, Minnesota.

On the morning of February 16, 2008, at least three people called 911 to report Ulrich's body in the apartment building hallway. After the police arrived at the

building, Eric and Anthony decided to talk to investigators. They made statements to police on three different occasions, having omitted details in the first two interviews in an attempt to minimize their involvement in the incident. The police arrested Ortega Sr. at Apartment A. Appellant and Lane were arrested at their friend's house in Austin around 8:30 p.m. on February 16, 2008.

Appellant was transported to the Mower County Law Enforcement Center. Bureau of Criminal Apprehension (BCA) Agents Michael Wold and Scott Mueller conducted a recorded interview with appellant on the night of February 16, 2008. As the agents entered the interview room, before the recording began, appellant asked the agents for information about his father and his girlfriend. Agent Wold told appellant to "just hold on a second" while everyone took their seats and Agent Wold started the recording device. Immediately after the recording began, appellant asked, "Am I suppose[d] to have a lawyer present?" Agent Wold replied, "Well that, that's what I'm going to tell ya, I'm going to give you your rights, okay?" Agent Wold first told appellant that the BCA was investigating Ulrich's death and described the possible charges pending against appellant's father and girlfriend. The following exchange then occurred:

> [WOLD]: Um, I give you this opportunity right now, Daniel, Danny, if you want to talk to us, that's great. If you don't, that is your choice. You mentioned a lawyer right away. I can't talk to you if you want to speak to a lawyer but I'm going to give you your rights, listen to them, but understand that I'm not going to have an idea and [Agent Mueller]'s not going to have an idea as to what happened in that room from your prospective [sic] last night, what you're saying happened unless you tell us.

> [APPELLANT]: It's not going to matter what I say though.

> [WOLD]: Well, if it's what you and your dad say, if what you and your dad say is, is close, ah, and it paints a different story then [sic] other people are saying, then it's more believable isn't it, two, two people say one thing but I need for you to say that and before you do that, before I ask any questions specifically about this incident, ah, it's ah, a law, it's a rule that I have to give you your rights, okay? And I just ask you to be open minded and talk to us and tell us your version of things, okay? Um, number one you have the right to remain silent, anything you say can and will be used against you in the court of law. You have the right to a lawyer and to have that lawyer with you while you are being questioned. If you can't afford to hire a lawyer, one will be appointed to represent you without any cost to yourself. Do you understand those rights Danny?

> [APPELLANT]: Yes sir.

> [WOLD]: Okay. And having, and keeping in mind everything that we've talked about as I'm, as I was explaining your rights to you, do you want to tell us your side of the story tonight?

> [APPELLANT]: Yeah.

Agents Wold and Mueller then interrogated appellant without the presence of counsel.

At the beginning of the interview, appellant admitted kicking Ulrich "a couple times" after Ulrich hit his father with the light stand. Appellant denied any knowledge of the stabbing. When Agent Wold told appellant that he knew appellant usually carried a knife, appellant appeared to become agitated. Appellant told Agent Wold that he last saw the knife in his father's possession and did not know its present location. Agent Wold then asked

appellant about the events following Ulrich's death. Agent Wold later returned to the issue of the knife and told appellant that Ortega Sr. confessed to the agents that both he and appellant stabbed Ulrich. Agent Wold told appellant, "[T]he whole knife thing I just think you, you're having a tough time admitting that when your dad says that you two both stabbed him. You guys were both stabbing him because he was coming at ya." Appellant denied that Ulrich came at him and the following exchange occurred:

> [WOLD]: Um-hm. I wish you'd just tell me the truth Danny, I really, I respect ya, and I just, and I respect you a lot more . . .
>
> [APPELLANT]: I ain't got nothin' else to say man. That's it, I'm through. I told you.
>
> [WOLD]: Well, I'm confused, why . . .
>
> [APPELLANT]: I'm getting hard headed right now so just please, I'm through. Seriously.
>
> [WOLD]: Okay, well I just want to give you a chance to, to tell us everything, I'm just confused about ah, why you won't just tell us where . . .
>
> [APPELLANT]: I told you, I didn't, I the last time I seen that knife, my dad had it.

Soon after this colloquy, Agent Mueller mentioned that he spoke with Ortega Sr. and could tell that appellant and his father had a close relationship. In response, ap-pellant began to cry and confessed that he stabbed Ulrich. Appellant told Agent Mueller that Ulrich "kept saying stop stabbing me." When asked what it felt like to stab Ulrich, appellant said, "It was like butter . . . it just went."

On February 18, 2008, BCA Investigator Jeremy Gunderson conducted a second interview with appellant. During this account, appellant admitted that he kicked Ulrich in the face and stabbed him at least twice in his side. Appellant stated that after grabbing the knife from the floor of the garage, "I looked down before I started kickin' him and I was like, should I or should I not. And I was like fuck it so I kicked him in the face and then before I ran out I (Makes noise) pop pop and then I was gone."

A grand jury ultimately indicted appellant on four felony charges including aiding and abetting first-degree premeditated murder.[3] Appellant pleaded not guilty and demanded a jury trial.

Appellant filed a pretrial motion to suppress the statements he made to the BCA agents on February 16 and 18, 2008.[4] Appellant argued that the February 16, 2008, statement violated his state and federal constitutional rights to remain silent and to have counsel present during custodial interrogation. Appellant further argued that the February 18, 2008, statement must be suppressed as fruit of the poisonous tree. The district court heard testimo-

---

**3.** The indictment also charged appellant with aiding and abetting first-degree felony murder while committing or attempting to commit a burglary, Minn.Stat. §§ 609.185(a)(3), 609.582, subd. 1(a), 609.05, subd. 1 (2010); aiding and abetting second-degree intentional murder, Minn.Stat. §§ 609.19, subd. 1(1), 609.05, subd. 1 (2010); and aiding and abetting second-degree felony murder while committing second-degree assault, Minn.Stat. §§ 609.19, subd. 2(1), 609.222, subd. 1, 609.05, subd. 1 (2010).

**4.** The procedural facts of appellant's case are unique because the omnibus issues were resolved before the indictment issued. The State charged appellant by complaint with one count of second-degree intentional murder on February 19, 2008. On June 11, 2008, appellant moved to suppress the two statements at issue. The district court denied appellant's motion on December 12, 2008. On January 29, 2009, the grand jury indicted appellant, and appellant waived his right to an omnibus hearing on the indictment.

ny on these issues at an omnibus hearing on August 15, 2008, and October 8, 2008.[5]

At the omnibus hearing on August 15, 2008, Agent Wold testified that he believed appellant was soliciting personal advice from Agent Wold when appellant asked whether he was supposed to have a lawyer present. With respect to appellant's statement that he was "through," Agent Wold understood it as an assertion that appellant "did not want to talk specifically about the stabbing or about the knife." Appellant testified that after hearing the *Miranda* warning, he understood his rights to have a lawyer present and to remain silent, but felt he had to talk because he thought the agents would continue to ask him questions until appellant said something. The district court denied appellant's motion to suppress the statements.

Both statements were played for the jury at trial. The State also offered testimony from the medical examiner, Dr. Michael McGee, who testified that Ulrich bled to death from eight stab wounds and one puncture wound. Dr. McGee gave a detailed description of the most severe stab wounds, which perforated Ulrich's ribs, right lung, pericardial sac, liver, diaphragm, and heart. According to Dr. McGee, several of these stab wounds would have been fatal on their own. Dr. McGee stated that the bleeding would have caused Ulrich to lose consciousness within five minutes. Dr. McGee also testified that the knife recovered from Schmoll's home matched the wounds on Ulrich's body.

The State called several witnesses who recounted inculpatory statements appel-

lant made in the hours between the murder and his arrest. Lane testified that appellant called his mother, who lived in Florida, and "told her that he had stabbed somebody, and he needed a place to go." One of appellant's friends testified that appellant asked him to come over early in the morning on the day after the murder. When the friend arrived, appellant said that he "did something dumb the night before" and that "there was a fight, some people got hurt." Another friend testified that appellant called him and said "I did something really bad and I'm going to go down." When appellant and Lane arrived at their friend's home in Austin, appellant said "that he had killed somebody last night." He later gave more details about the fight, laughing when he said the dead man had one arm.

Witnesses testified that appellant continued to make inculpatory statements after his arrest. As investigators drove appellant to the law enforcement center, appellant spontaneously said that he should have had sex with his girlfriend and gotten high because he would not be able to do either for a while. He then said that no one deserves to die, but "[s]hit happens." Appellant told the booking officer that he "jinxed" himself and explained, "I always told myself if I was going to come back to jail, it would be for killing someone, and it actually happened." A few minutes later, appellant said, "It's trippy how fast things happen when you are in a situation like that." After a deputy explained operational procedures at the jail, appellant spontaneously said, "I murdered somebody." The deputy told appellant to "[s]top it," but appellant continued, "I stuck him four

---

5. At the initial omnibus hearing, appellant testified that he expressly invoked his *Miranda* rights off the record in the presence of Agent Mueller. Because Agent Mueller was not an anticipated witness, the court continued the hearing to October 8, 2008. At that time, Agent Mueller denied that appellant invoked his *Miranda* rights. The district court found that appellant's allegation was not credible. Appellant does not raise this argument again on appeal.

times and my dad three times, and I left his ass on the floor. I mean he was dead."

The defense rested without presenting any witnesses. During deliberations, the jury asked the district court to replay appellant's February 18, 2008, statement to the BCA investigators. The jury returned guilty verdicts on each count of the indictment. The district court convicted appellant of aiding and abetting first-degree premeditated murder and sentenced him to a term of life in prison without the possibility of parole.

■■■ We must now decide whether the district court erred when it denied appellant's pretrial motion to suppress statements made to law enforcement officers after appellant allegedly invoked his state and federal constitutional rights to remain silent and to have counsel present during custodial interrogation. The United States and Minnesota Constitutions protect a defendant's right to be free from compelled self-incrimination. *See* U.S. Const. amend. V; Minn. Const. art. I, § 7 (both stating that no "person shall ... be compelled in any criminal case to be a witness against himself"). In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court set forth prophylactic measures to protect suspects from the inherently coercive nature of custodial interrogations. Specifically, "[p]rior to any [custodial] questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444, 86 S.Ct. 1602; *State v. Crisler,* 438 N.W.2d 670, 671 (Minn.1989). Statements stemming from custodial interrogation are inadmissible unless the suspect "voluntarily, knowingly and intelligently" waives these rights. *Miranda,* 384 U.S. at 474, 476, 86 S.Ct. 1602.

A waiver of *Miranda* rights does not preclude a suspect from later invoking those rights at any time prior to or during the custodial interrogation. *Id.* at 473–74, 86 S.Ct. 1602. Appellant alleges that he invoked both his right to remain silent and his right to counsel during the February 16, 2008, interview with the BCA agents. We disagree.

I.

We first address appellant's argument that his statements were admitted in violation of his constitutional rights because appellant unambiguously invoked his right to remain silent when he told Agent Wold he was "through." The district court found that appellant did not adequately invoke his right to silence because the "dialogue is ambiguous at best in the sense that the referenced statements are very brief, isolated and indefinite; it is not protracted, unrelenting, or explicit, under anybody's reasonable understanding."

■■■ The validity of a suspect's invocation of his right to remain silent presents a mixed question of fact and law. *See State v. Chavarria-Cruz,* 784 N.W.2d 355, 363 (Minn.2010). A suspect must state his intention to remain silent "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be an invocation of the right to remain silent." *State v. Day,* 619 N.W.2d 745, 749 (Minn.2000). We review factual issues of whether a suspect unequivocally and unambiguously invoked his right to silence for clear error. *See State v. Ganpat,* 732 N.W.2d 232, 239 (Minn.2007). We review de novo the application of the reasonable officer standard to the facts of the case. *Chavarria-Cruz,* 784 N.W.2d at 363.

■■ If a suspect invokes his right to remain silent, law enforcement officers must cease interrogation and "scrupulously

honor[ ]" the suspect's right to remain silent. *Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); *State v. Williams,* 535 N.W.2d 277, 282 (Minn.1995). But "nothing short of an unambiguous or unequivocal invocation of the right to remain silent will be sufficient to implicate *Miranda*'s protections." *Williams,* 535 N.W.2d at 285 (declining to adopt the "stop and clarify" rule discussed *infra* ); *see also Berghuis v. Thompkins,* ___ U.S. ___, ___, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010) (stating that under the federal constitution, *Miranda* rights—including the right to remain silent-must be unambiguously and unequivocally invoked before the police must cease questioning). We now decide whether appellant unambiguously and unequivocally articulated his desire to remain silent such that a reasonable law enforcement officer in the circumstances would understand appellant's statement to be an invocation of the right to remain silent. *See Day,* 619 N.W.2d at 749.

In deciding this question, we are guided by our analysis in *Williams,* 535 N.W.2d at 280–85. *Williams* involved the interrogation of a sixteen-year-old suspect in a double homicide. *Id.* at 279–80. After about an hour of questioning, one of the two interrogating detectives accused the defendant of lying. *Id.* at 280–81. The defendant lost his composure, told the detective,

"I don't have to take any more of your bullshit," and walked out of the interrogation room. *Id.* at 281. The detectives waited five minutes before resuming their questioning, at which point the defendant made inculpatory statements. *Id.* This court found the defendant's "desire with respect to his right to remain silent was ambiguous or equivocal at best." *Id.* at 285. Specifically, we noted the following: (1) the defendant "never said that he wanted to stop answering questions"; (2) the defendant "never exhibited a general refusal to answer any of the questions the detectives wanted to ask"; and (3) the facts supported the detectives' belief that the defendant's statement was a response to the detective's accusation of dishonesty.[6] *Id.* at 284 & n. 2.

■■■■■ In this case, appellant told BCA agents, "I ain't got nothing else to say man. That's it, I'm through. I told you." Appellant's assertion that he was "through" could be interpreted as a "general refusal to answer any of the questions the [agents] wanted to ask" if the statement was read in isolation. *See id.* But we review invocations of the right to remain silent in light of all the circumstances. *See Day,* 619 N.W.2d at 749; *Williams,* 535 N.W.2d at 285. Appellant's statement "I told you" indicates that he was "through" discussing a topic the

---

**6.** In *Williams,* we declined to hold that a suspect's hostile behavior could constitute an unambiguous invocation of the suspect's right to remain silent. 535 N.W.2d at 283. As support for this holding, we noted that "[t]o hold otherwise would encourage judicial second-guessing of police officers as to the meaning of a suspect's actions." *Id.* This desire to avoid "judicial second-guessing of police officers" as articulated in *Williams* arguably suggests that we intended to create a subjective standard of review in the right to remain silent context. But five years later in *Day*— without overruling *Williams*—we announced an objective standard of review for invoca-

tions of the right to remain silent: a *reasonable* officer's understanding of the suspect's statement. 619 N.W.2d at 749. Thus our case law is arguably inconsistent on the proper standard of review for invocations of the right to remain silent. Nevertheless, in this case, Agent Wold's testimony at the omnibus hearing makes clear that he subjectively believed appellant did not invoke his right to remain silent. Because we conclude that appellant's statement in this case was not an invocation of his right to silence under either an objective or subjective standard, we leave the issue of the appropriate standard of review for another day.

agents had already exhausted. In the twenty-five minutes leading up to appellant's alleged invocation, the agents asked repeated questions about the knife and the stabbing, backing off and discussing other topics when they encountered resistance from appellant. The agents first asked appellant about the stabbing and whether the Ortegas had a knife when they entered the garage. Appellant said he did not know if his father had a knife and denied carrying a knife himself. Agent Wold moved on and asked who was present during the stabbing and appellant provided an answer. Agent Wold then returned to the topic of the knife and informed appellant that the agents knew appellant typically carried a particular knife and followed up with several questions regarding the location of that knife. When appellant again denied having possession of the knife, the agents once again moved on to discuss other topics.

Immediately prior to appellant's alleged invocation of his right to silence, Agent Wold returned to the issue of the knife and the stabbing when he told appellant: "The whole, the whole knife thing I just think you, you're having a tough time admitting that when your dad says that you two both stabbed him. You guys were both stabbing him because he was coming at ya." During these twenty-five minutes of the interview, Agent Wold asked appel-

lant questions relating to the knife a total of eight times and each time appellant either denied carrying the knife or said he had not seen it. As Agent Wold testified at the omnibus hearing, "[I]f you read the statement in its entirety up until that point, you can determine that Mr. Ortega, Jr., has no problems answering any other questions except when he starts talking about the knife or the specific parts about stabbing."[7] Thus, after considering appellant's statement in the context of the discussion to that point, a reasonable officer could conclude that appellant's assertion meant he was "through" talking about the knife and the stabbing. Because appellant's statement yields two equally persuasive interpretations, we agree with the district court's finding that appellant's statement was an ambiguous and equivocal invocation of the right to silence "under anybody's reasonable understanding."

Appellant argues that *State v. Day* is most analogous to this case. In *Day*, we held that the defendant unambiguously and unequivocally invoked his right to remain silent when he told officers, " 'Said I don't want to tell you guys anything to say about me in court.' " 619 N.W.2d at 750. Our analysis focused on the structure and context of the defendant's statement. *Id.* at 749–50. The first portion of the defendant's statement—"Said I don't want to tell you guys anything"—was clearly un-

---

7. Statements appellant made after his alleged invocation of his right to silence further support an interpretation that appellant meant he was "through" talking about the knife and the stabbing. Specifically, appellant's statement immediately after the alleged invocation—"*I told you*, I didn't, I the last time I seen that knife, my dad had it"—indicates that his previous declaration also concerned the knife. (Emphasis added.) Similarly, after appellant admitted he stabbed Ulrich, Agent Wold asked how many times Ulrich was stabbed and appellant said, "Can you just leave me alone about that s[h]it, *I already told you* I did."

(Emphasis added.) At oral argument, appellant claimed that we should not consider these statements when deciding whether appellant's alleged invocation was ambiguous because a valid invocation of the right to silence would render any subsequent statements a violation of appellant's constitutional rights. Because we find that appellant's invocation was ambiguous independent of any subsequent dialogue, we need not address the propriety of considering statements made after an alleged invocation of the right to silence.

ambiguous. *Id.* at 750. The second part parroted the language of the *Miranda* warning that the defendant heard only moments before he made the statement. *Id.*

Appellant's statement is not amenable to such straightforward dissection. Appellant did not tell the agents he did not *want* to talk with them. Appellant stated, "I ain't got nothing else to say man." This statement is ambiguous because it is unclear whether appellant lacked additional information or the desire to share it. Unlike *Day*, in which the defendant's statement implicitly referenced a recent *Miranda* warning, appellant's alleged invocation of his right to silence occurred long after receiving the *Miranda* warning. As the district court observed, appellant was "incessantly cooperative" with the agents throughout the interview. Unlike Day's refusal to say *anything* to his interrogators, appellant's behavior indicated that he had no reservations about talking with the agents. *See also State v. Jobe,* 486 N.W.2d 407, 416 (Minn.1992) (holding that a defendant's statement that he did not want to talk about what he did the night before but was willing to talk about "lighter" subjects was not an unequivocal invocation of his right to remain silent in part because the defendant previously exhibited willingness to talk with police).

Based on the totality of circumstances presented in the record, the district court's factual findings were not clearly erroneous. Because appellant's statement could be interpreted as either a general refusal to answer the agents' questions or an expression of unwillingness to discuss a specific topic, we hold that appellant failed to state his intention to remain silent sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be an invocation of the right to remain silent. We therefore affirm the district court's holding that appel-

lant did not unequivocally invoke his right to remain silent.

## II.

Appellant also asserts that the statements were erroneously admitted because he invoked his right to counsel at the outset of his first interview when he asked, "Am I suppose[d] to have a lawyer present?" Appellant argues that even if this question was an equivocal invocation of his right to counsel, Agent Wold failed to comply with Minnesota law requiring police to "stop and clarify" ambiguous requests for counsel before continuing a custodial interrogation. The district court held that appellant did not clearly and unequivocally invoke his right to counsel, and that the BCA agents properly clarified appellant's statement by explaining his *Miranda* rights and then encouraging appellant to share his side of the story so that investigators could understand appellant's perspective of the events leading to Ulrich's death.

Our standard for review of a suspect's invocation of his right to counsel mirrors our standard in the right to silence context. Factual determinations, such as "the suspect's precise words ... and the actions and impressions of the suspect and officer," are reviewed for clear error. *Chavarria–Cruz,* 784 N.W.2d at 363. We review de novo the district court's application of the reasonable officer standard. *Id.; see also State v. Ray,* 659 N.W.2d 736, 742 (Minn.2003). We take this opportunity to articulate an appropriate standard of review of a district court's ruling on whether police properly clarified an equivocal request for counsel. We will review de novo the application of the "stop and clarify" rule from *State v. Robinson,* 427 N.W.2d 217, 223 (Minn.1988), but defer to any factual findings by the district court that are not clearly erroneous.

 We first consider whether appellant unequivocally invoked his right to counsel. It is a violation of the U.S. Constitution for investigators to continue a custodial interrogation after a suspect has unambiguously requested the assistance of counsel. *See Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (holding that interrogation must cease if the suspect unambiguously asserts his right to counsel); *see also State v. Munson,* 594 N.W.2d 128, 139 n. 1 (Minn. 1999) (stating that the court need not address whether an officer clarified the defendant's request for counsel as required by state law because the invocation "was sufficiently clear to meet even *Davis'* more stringent requirements"). To invoke the right to counsel a suspect must do more than make reference to an attorney. *See State v. Risk,* 598 N.W.2d 642, 649 (Minn.1999) (citing *Edwards v. Arizona,* 451 U.S. 477, 484, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). A suspect's request for counsel is unequivocal if " 'a reasonable police officer, in the circumstances, would understand the statement to be a request for an attorney.' " *Munson,* 594 N.W.2d at 139 (quoting *Davis,* 512 U.S. at 459, 114 S.Ct. 2350).

Appellant's statement was not a request for an attorney; it was an inquiry as to whether he needed an attorney. *See State v. Pilcher,* 472 N.W.2d 327, 332 (Minn. 1991) (finding that the defendant made an equivocal request for counsel by asking whether the officer thought the defendant should have an attorney); *cf. State v. Hannon,* 636 N.W.2d 796, 804–05 (Minn. 2001) (" 'Can I have a drink of water and then lock me up-I think we really should have an attorney' " was an unequivocal request for an attorney); *Munson* 594 N.W.2d at 139–40 (" 'I think I'd rather talk to a lawyer' " was an unequivocal request for counsel). The district court did not err when it held that appellant failed to unequivocally invoke his right to counsel because a reasonable police officer under these circumstances would not understand appellant's question to be a request for an attorney.[8]

 Under the U.S. Constitution, a suspect must unambiguously and unequivocally invoke his right to counsel and investigators are not required to clarify ambiguous requests for an attorney. *See Davis,* 512 U.S. at 459–60, 114 S.Ct. 2350. But we have held that suspects in Minnesota are afforded greater protection against compelled self-incrimination. *See Risk,* 598 N.W.2d at 648. The right to counsel under the Self–Incrimination Clause protects a suspect's desire to speak with police *only* through counsel. *See McNeil v. Wisconsin,* 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (citing *Edwards,* 451 U.S. at 484, 101 S.Ct. 1880). Consequently, when a suspect makes an equivocal or ambiguous statement that could be construed as a request for counsel, investigators must cease questioning the suspect except as to "narrow questions designed to 'clarify' the accused's true desires respecting counsel." *Robinson,* 427 N.W.2d at 223.

 This "stop and clarify" rule ensures that suspects are aware of their right to have counsel present during a

---

**8.** Although not raised by the parties, there is an argument that appellant's question did not rise to the level of even an equivocal invocation of his right to counsel. *See, e.g., Risk,* 598 N.W.2d at 649 (holding that the defendant did not invoke his right to counsel because his statement "I wanna call my lawyer," when read in context, "did not represent a request to terminate the interrogation until his counsel was present"). But because we conclude that the BCA agent properly clarified appellant's statement, we need not make such a distinction here.

custodial interrogation so that any subsequent waiver of this right is knowing and intelligent. Our case law illustrates that proper recitation of the suspect's constitutional rights is key to proper clarification. *See, e.g., Hannon,* 636 N.W.2d at 805 n. 2 (stating in dicta that an officer's statement that defendant's "side of [the] story [would] *never* be known" if he requested counsel was not a proper clarification because it "implied that [the defendant] had to make a choice between either talking to an attorney and never having his side of the story known or continuing to talk with officers" (alterations in original) (emphasis added)); *Pilcher,* 472 N.W.2d at 332 (holding that the defendant validly waived his right to counsel when, after equivocally invoking the right while simultaneously expressing a desire to tell his side of the story, police "explained that they could speak only if [the defendant] first agreed to waive counsel"); *State v. Doughty,* 472 N.W.2d 299, 303 (Minn.1991) (finding that police failed to clarify a defendant's equivocal request for counsel when the officer simply "continued the interrogation by stating, 'I'm very interested in hearing your side of the story' "). The prophylactic warnings announced in *Miranda* and its progeny guarantee that "a defendant's waiver of his right against compelled self-incrimination and his right to counsel during custodial interrogation [must] be knowing, intelligent and voluntary." *State v. Beckman,* 354 N.W.2d 432, 436 (Minn. 1984). Consequently, we hold that when a suspect makes an equivocal invocation of the right to counsel, providing the suspect with an accurate *Miranda* warning is sufficient as a matter of law to satisfy the "stop and clarify" rule.

■ Applying this rule to the facts before us, the issue is whether Agent Wold *both* stopped and clarified appellant's equivocal request for counsel. *Robinson* requires investigators to stop questioning a suspect who equivocally invokes the right to counsel except as to "narrow questions" regarding the presence of counsel. 427 N.W.2d at 223. In this case, Agent Wold and appellant had a conversation before Agent Wold read appellant his *Miranda* rights. But Agent Wold did not interrogate appellant in the time between appellant's equivocal request for a lawyer and the *Miranda* warning. In fact, Agent Wold's statements during that time responded to questions and statements from appellant.

According to Agent Wold's testimony at the omnibus hearing, the conversation between Agent Wold and appellant began as soon as Agent Wold entered the interview room, when appellant asked "questions about what was going on, what was happening with his father and what was happening with his girlfriend." Agent Wold informed appellant that Ortega Sr. had been arrested, and began recording the conversation. Appellant then asked whether he was supposed to have a lawyer present. Agent Wold immediately responded, "I'm going to give you your rights, okay?" and then answered appellant's unrecorded questions "about what was going on" by telling appellant that Ortega Sr. and Lane had been arrested, naming the charges they faced, and informing appellant that law enforcement officers were investigating Ulrich's death. Agent Wold then explained, "I can't talk to you if you want to speak to a lawyer," told appellant that he was going to read appellant his rights, and noted that investigators would not know appellant's perspective of Ulrich's death unless appellant told them.[9] Appellant then interrupted Agent

9. Appellant does not argue that his statement was coerced in violation of his constitutional

right to due process. Furthermore, we have recognized that "the police must also be al-

Wold and said, "It's not going to matter what I say though." Agent Wold responded by saying that appellant's story may be "more believable" if it corresponded with what Ortega Sr. told investigators. At that time, Agent Wold read appellant a *Miranda* warning:

> [WOLD]: ... [N]umber one you have the right to remain silent, anything you say can and will be used against you in the court of law. You have the right to a lawyer and to have that lawyer with you while you are being questioned. If you can't afford to hire a lawyer, one will be appointed to represent you without any cost to yourself. Do you understand those rights Danny?
>
> [APPELLANT]: Yes sir.
>
> [WOLD]: Okay. And having, and keeping in mind everything that we've talked about as I'm, as I was explaining your rights to you, do you want to tell us your side of the story tonight?
>
> [APPELLANT]: Yeah.

Agent Wold properly stopped and clarified appellant's equivocal request for counsel. Although these facts present a close case because Agent Wold did not immediately inform appellant of his *Miranda* rights, we conclude that Agent Wold's conversation with appellant did not exceed the "narrow questioning" prescribed in *Robinson.* Furthermore, the warning Agent Wold provided to appellant was accurate under our case law. *See Crisler,* 438 N.W.2d at 672. Unlike *Hannon,* Agent Wold did not go so far as to say appellant would *never* have the opportunity to make a statement if he asked for counsel. Appellant was told that the agents could not speak with him if he wanted to speak to a lawyer. After appellant indicated that he understood this right, Agent Wold asked whether appellant wanted to talk to the agents. Appellant's affirmative response to Agent Wold's question implied that appellant did not want counsel present during the interview.

We therefore conclude that Agent Wold properly clarified appellant's equivocal invocation of his right to counsel. Accordingly, because appellant did not unequivocally invoke his right to silence and because law enforcement officers properly clarified appellant's ambiguous request for counsel, the district court did not err when it denied appellant's motion to suppress his statements to law enforcement officers.[10]

Affirmed.

---

lowed to encourage suspects to talk where the suspect has not clearly refused." *State v. Merrill,* 274 N.W.2d 99, 108 (Minn.1978); *accord State v. Patricelli,* 357 N.W.2d 89, 93 (Minn. 1984).

10. Pursuant to Minn. R.Crim. P. 29.04, subd. 6, the State presented an alternative argument on appeal that the "stop and clarify" rule has no basis in the Minnesota Constitution. The State argues that the "stop and clarify" rule announced in *Robinson,* 427 N.W.2d at 222–23, was simply an interpretation of the federal constitutional right against self-incrimination discussed in *Edwards,* 451 U.S. at 485–86, 101 S.Ct. 1880. As such, the State argues that the Supreme Court overruled *Robinson* when it decided *Davis,* 512 U.S. at 459, 114 S.Ct. 2350, which holds that the U.S. Constitution does not require officers to clarify an equivocal request for counsel. *See also Thompkins,* —— U.S. at ——, 130 S.Ct. at 2259–60 (reaffirming this holding from *Davis* ). As support for the proposition that *Robinson* lacks grounding in the Minnesota Constitution, the State notes that we have never analyzed the "stop and clarify" rule as a protection under the state constitution. *See State v. Parker,* 585 N.W.2d 398, 405 (Minn.1998) (inaccurately citing *Robinson* and *State v. Juarez,* 572 N.W.2d 286, 290 (Minn.1997), for the proposition that "stop and clarify" is a state constitutional protection). Because we hold that Agent Wold properly clarified appellant's statement by reading a *Miranda* warning, it is unnecessary to explore the origins of the "stop and clarify" rule.

PAGE, Justice (concurring in part, dissenting in part).

I concur in the result reached by the court in today's decision. I respectfully dissent, however, from that part of the decision holding that the trial court did not err when it allowed into evidence Ortega's statements to the BCA agents. Under our case law, the statements were inadmissible because Ortega unequivocally invoked his right to remain silent and because the agents failed to stop and clarify Ortega's equivocal invocation of his right to counsel.

## I.

Both this court and the U.S. Supreme Court have long held that, once a suspect invokes his right to remain silent, law enforcement agents must cease interrogation and "scrupulously honor[ ]" the suspect's right to remain silent. *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); *State v. Williams*, 535 N.W.2d 277, 282 (Minn.1995). As I stressed in my concurrence and dissent in *Williams*, this rule is meant to prevent "police from 'persisting in repeated efforts to wear down [the accused's] resistance and make him change his mind.'" 535 N.W.2d at 290 (Page, J., concurring and dissenting) (quoting *Smith v. Illinois*, 469 U.S. 91, 95 n. 2, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984)).

Here, Ortega unambiguously and unequivocally invoked his right to remain silent twice. The first time he said, "I ain't got nothin' else to say man. That's it, I'm through. I told you." The second time he stated, "I'm getting hard headed right now so just please, I'm through. Seriously." Viewed in context, a reasonable law enforcement officer should have understood Ortega's statements to mean that, at the time they were made, Ortega had "nothin' else to say" and that he was seriously "through" talking with the police.

At that point, the officers should have honored Ortega's invocation of his right to remain silent.

In support of its conclusion that Ortega was equivocal in invoking his right to remain silent, the court claims that Ortega may have been talking only about the particular subject of the knife. *Supra* at 69–70. This strained reading requires this court to read into Ortega's words limiting terms that simply are not present—Ortega's plain language is not limited to the discussion of the knife. Nor does the context in which the statements occurred suggest any such limitation. In the five minutes leading up to Ortega's invocation of his right to remain silent, Ortega was questioned on a wide range of topics regarding his movements and interactions after the murder, including: changing clothes, lying down, going to his cousin's apartment, going to his girlfriend's mother's house, showering, avoiding the police, and deciding to not turn himself in. Given the scope of the interrogation immediately preceding the invocation of his right to remain silent, the court's suggestion that Ortega simply did not want to talk about the knife is unsupported by the record.

Not only did Ortega's interrogators not honor his right to remain silent, their efforts were geared toward wearing down Ortega's resolve to remain silent. Ortega first said, "I ain't got nothin' else to say man. That's it, I'm through. I told you." Rather than honoring Ortega's desire to remain silent, one of the agents pushed Ortega to talk more by inviting him to clarify the agent's alleged confusion. In response, Ortega again unequivocally invoked his right to remain silent, stating, "I'm getting hard headed right now so just please, I'm through. Seriously." Again, the agent refused to honor Ortega's right to remain silent. Although he acknowl-

edged Ortega's request by stating, "okay," the agent then immediately encouraged Ortega to continue talking by stating he was confused and invited Ortega to clarify his story for them. This is the precise police behavior expressly prohibited by *Smith,* 469 U.S. at 95 n. 2, 105 S.Ct. 490.

## II.

Both this court and the United States Supreme Court have also recognized that a suspect's right to have counsel present during interrogation is "an indispensable prophylactic measure to protect the constitutional privilege against self-incrimination." *State v. Chavarria–Cruz,* 784 N.W.2d 355, 360 (Minn.2010) (citations omitted); *see also Miranda v. Arizona,* 384 U.S. 436, 469, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). For purposes of vindicating that right, Minnesota law affords greater protection to a suspect invoking his right to counsel than does federal law. Under Minnesota law, when a suspect's request is "equivocal or ambiguous" but "subject to a construction that the accused is requesting counsel, all further questioning must stop except that narrow questions designed to 'clarify' the accused's true desires respecting counsel may con-

tinue." *State v. Risk,* 598 N.W.2d 642, 647–48 (Minn.1999) (quoting *State v. Robinson,* 427 N.W.2d 217, 223 (Minn.1988)).

Here, well before he was given a *Miranda* warning, Ortega asked the interrogating law enforcement agents, "Am I supposed to have a lawyer present?" At a minimum, this statement was an equivocal request for an attorney. *See State v. Doughty,* 472 N.W.2d 299, 303 (Minn.1991) (holding the statement, "Shouldn't I have an attorney so you don't ask me any illegal questions?" as an equivocal request for counsel). Indeed, the record indicates that the agent doing the questioning understood this question by Ortega to be such a request. In response, the agent replied, "Well that, that's what I'm going to tell ya, I'm going to give you your rights, okay?" While that initial response was appropriate, the agent did not proceed to give Ortega his rights or otherwise stop the interrogation except for "narrow questions" designed to clarify Ortega's desires with respect to counsel. What the agent did was to persist in making statements designed to encourage Ortega to answer questions without the assistance of counsel.[1] Specifically, the agent told Ortega

---

1. Ortega's question and the relevant portion of the Bureau of Criminal Apprehension agent's response follows:

 [ORTEGA]: Am I suppose[d] to have a lawyer present?

 [AGENT]: Well, that, that's what I'm going to tell ya, I'm going to give you your rights, okay? And as, as I explain to you just before we turned on the tape that your dad was arrested earlier today, okay, for probable cause homicide. [A] gentleman that you and he got into a fight with last night ended up dead in a hallway. I've taken a statement from him, taken statements from other two, two other witnesses that were there and present for it, ah, Vernea brothers, ah, so I have a very good understanding of what took place there okay, and right now I'm giving you an opportunity to tell us your side of the story. Ah, I don't know

 what the fight was specifically about, I don't know what Troy did to, ah, to if he started this, I have no idea but what I want to get from you is your side of the story. As I told you, your father was arrested earlier this morning at his apartment with your grandfather, your grandfather's apartment, um, they're doing search warrants right now, they're doing all kinds of evidence collecting ah, we just arrest you and your girlfriend at a house here in Austin, and at this point, you know, she's facing charges of aiding and abetting because she was up there with you when this occurred, okay? And you guys were calling all night to try and get some help to get picked up up there and get brought down here to somewhere that was, what you thought was at least safe, okay? Um, I give you this opportunity now, Daniel, Danny, if you want to talk to

that he could not talk to him if Ortega talked to a lawyer and that the agents would not "have an idea as to what happened in that room from [Ortega's] prospective [sic]" if Ortega did not tell them. Clearly, the agent did not want Ortega to unequivocally invoke his right to counsel. This fact is highlighted by the agent's failure to "clarify" whether Ortega wanted a lawyer after he received the *Miranda* warning. Rather than ask Ortega if he wanted counsel, the agent asked him if he "want[ed] to tell us your side of the story tonight." [2] An affirmative answer to that question is not necessarily a negative answer to his desire to have an attorney present. In the end, the agent neither stopped his interrogation nor clarified Ortega's desires regarding counsel.

### III.

For the foregoing reasons, I conclude that the trial court erred when it allowed into evidence the statements Ortega made after he unequivocally invoked his right to

remain silent as well as all of the statements Ortega made during the interrogation after the police failed to stop and clarify his desire to invoke his right to counsel. I also conclude, however, that on the record before us, the errors were harmless beyond a reasonable doubt because, given the other evidence of Ortega's guilt produced at trial, the jury's verdict was surely unattributable to the errors. *See State v. Juarez,* 572 N.W.2d 286, 292 (Minn.1997). On that basis, I also conclude that Ortega's conviction is properly affirmed.

ANDERSON, PAUL H., Justice (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Page.

us, that's great. If you don't, that is your choice. You mentioned a lawyer right away. I can't talk to you if you want to speak to a lawyer but I'm going to give you your rights, listen to them, but understand that I'm not going to have an idea and Scott's not going to have an idea as to what happened in that room from your prospective [sic] last night, what you're saying happened unless you tell us.

[ORTEGA]: It's not going to matter what I say though.

[AGENT]: Well, if it's what you and your dad say, if what you and your dad say is, is close, ah, and it paints a different story then [sic] other people are saying, then it's more believable isn't it, two, two people say one thing but I need for you to say that and before you do that, before I ask any questions specifically about this incident, ah, it's ah, a law, it's a rule that I have to give you your rights, okay? And I just ask you to be open minded and talk to us and tell us your version of things, okay? Um, number one you have the right to remain silent, any-

thing you say can and will be used against you in the court of law. You have the right to a lawyer and to have that lawyer with you while you are being questioned. If you can't afford to hire a lawyer, one will be appointed to represent you without any cost to yourself. Do you understand those rights Danny?

2. The court misconstrues the agent's statements to Ortega, suggesting that they were part of a "conversation," rather than an interrogation. The agent's statements clearly go beyond permissible "narrow questions" to determine Ortega's request; rather, the agent's statements are aimed at encouraging Ortega to continue to talk, in violation of the stop-and-clarify rule. *Risk,* 598 N.W.2d at 647–48. The agent's obligation upon an ambiguous invocation of the accused's right to counsel is to stop the interrogation entirely, and then, only after clarifying the suspect's request, continue the interrogation only if the suspect agrees to speak with the agent without an attorney present.